[No. S030956. Nov. 29, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM JAMES RAMOS, Defendant and Appellant.

## Counsel

Katherine Alfieri and Mark R. Vermuellen, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald S. Matthias and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

CHIN, J.—In 1991, an information charged defendant with three counts of murder (Pen. Code, § 187),[1] with a personal use of a firearm enhancement on each count. (§ 12022.5, subd. (a).) The information included a multiple-murder special-circumstance allegation (§ 190.2, subd. (a)(3)), and charged two violations of section 12021, subdivision (a) (felon in possession of a firearm). In addition, defendant was charged with two enhancements under section 667.5, subdivision (b) (prior violent-felony prison convictions). He was held in the Martinez Detention Facility.

Nearly a year later, county prison officials considered defendant a continuing threat to staff and inmate safety. A judge ordered him removed from Martinez to San Quentin, where he engaged in criminal and other questionable activity. He attacked a jailhouse deputy, threatened the same deputy, and allegedly hoarded medication for a possible suicide attempt. Defendant also filed numerous complaints about staff procedural violations.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

Three months after he was placed in San Quentin, defendant pleaded guilty to all charges. The court determined that the murders were of the first degree and made a specific finding that defendant was competent to make the plea. (§ 1368.) In November 1992, after a penalty trial, the jury returned a verdict of death. The trial court denied defendant's motions for new trial (§ 1181) and to modify the penalty verdict (§ 190.4, subd. (e)), and sentenced him to death. This appeal is automatic.

## I. Facts

### A. The Charged Crimes

#### 1. Tonya Karr Murder

On March 7, 1991, at approximately 7:20 p.m., neighbors in the vicinity of 706 J Street in Antioch heard a male shouting, followed by two gunshots. They saw a stocky White male with long hair leave 706 J Street, walk to an adjacent parking lot, and get into a Ford pickup truck with a camper shell on the back. When Antioch police responded to the scene, they found Tonya Karr lying in a pool of blood with two gunshot wounds to her head. She died the next day. Mary Cagle, defendant's ex-wife and Karr's mother, had seen defendant leaving the parking lot next to Karr's apartment earlier in the evening.

#### 2. Minnie Mae Coombs Murder

Minnie Mae Coombs was Cagle's sister. At 8:30 p.m. on March 7, 1991, Coombs's daughter, Theresa Bodkin, went to Coombs's residence looking for her mother. She heard Ramos's voice on Coombs's answering machine stating that Coombs could be found in the parking lot next door. Coombs was found dead in her car. She had been shot once in the chest and once in the head.

#### 3. Janice Butler Murder

On March 6, 1991, defendant picked up his girlfriend, Janice Butler, from her house. Two days later, her body was found in the camper portion of defendant's pickup truck as it was parked at the Riverview Lodge in Antioch. That same day, defendant surrendered to police after they spotted him in a white van he also owned. Police then conducted a probation search of defendant's home and found evidence indicating that Butler had been shot and killed in defendant's home on the evening of March 6.

### B. *Other Crimes*

#### 1. *Prior Convictions*

The prosecution presented evidence of defendant's prior felony convictions. (§ 190.3, factor (c).) In October 1976, defendant attempted to kill his former girlfriend, Patricia Mowery, in Reno, Nevada. After Mowery, a card dealer at a Reno casino, ended her relationship with defendant, he damaged items in her house and was arrested for destruction of property. As he was led away, defendant threatened Mowery that he would return. That same evening, defendant approached Mowery at work and shot her in the chest. Defendant then surrendered his weapon to the pit boss, folded his jacket, sat down, and watched Mowery as she bled from the mouth and chest.

While awaiting trial, defendant asked his brother Steve to "do something" to Mowery. In early 1977, Steve told Nevada grand jury that his brother had said: "I want her dead." Defendant was convicted of attempted second degree murder and sent to the maximum security Nevada State Prison in Carson City.

Defendant had two other felony convictions, namely, battery with a deadly weapon in July 1979 in Washoe County, Nevada, and driving under the influence causing bodily injury in Sacramento, California in August 1990.

#### 2. *Prior Criminal Activity*

On December 2, 1976, while awaiting trial on the attempted murder charge in Washoe County jail, defendant exploded in a rage against jail personnel. He threw a cup of what he said was urine at Deputy Richard Pico, who was supervising the evening meal service. Later that night, defendant pounded his head against the wall for several hours, and told a supervising sergeant that he was going to kill Deputy Pico.

In March 1979, while serving time in Nevada State Prison on the attempted murder conviction, defendant heaved a tray of hot food at a correctional officer in charge of serving the dinner meal. Later that day, defendant threw a hard-boiled egg at the officer and later threatened him that he would get him "on his mother's grave." Defendant was moved to the prison segregation unit the next morning, where he threw a cup of urine at an officer who entered his cell.

In 1992, while awaiting trial in the present matter in Contra Costa County jail, defendant attacked Sheriff's Deputy Sean Dexter as he accompanied a

jail nurse on her "pill call" rounds, breaking Dexter's thumb and punching his head. Defendant later threatened to kill Dexter.

### C. Defense Evidence

Dr. Harry Kormos, a psychiatrist hired to examine defendant, testified that defendant suffers from a paranoid personality disorder due to the influence of several factors, including an abusive childhood and time spent fighting in Vietnam as a soldier during the Vietnam War. He characterized defendant's condition as a long-term behavior pattern that will last throughout defendant's lifetime. Dr. Kormos also noted that defendant's disorder does not mean that he is insane or that he does not appreciate the gravity of his acts; indeed, defendant knows what he is doing. Defendant's aunt testified that his mother, who eventually committed suicide, physically abused her children. His father isolated the family and actively discouraged contact with other people. He taught the children that "if you fight, fight to win." Defendant was known for his quick temper, which became more severe, with the potential for greater violence, after his Vietnam experience. Although there is no evidence defendant ever attempted to take his own life, defense counsel presented the evidence to show that defendant may have intended to commit suicide at a later date, thus supporting defendant's claim that he had a "death wish."[2] He apparently hoarded medication while in prison awaiting his penalty trial.

In addition, defendant's brother, Steve Ramos, testified that he and defendant were extremely close when they were children, but that trouble seemed to find them. Former Warden James Park testified that he believed defendant would adjust well to prison life and would remain in high-security prison for the remainder of his life.

## II. Discussion

### A. Motion to Suppress Evidence

Before pleading guilty, defendant raised several claims in a motion to suppress the evidence found in a police search of defendant's house and pickup truck, including Janice Butler's body, a bloodstained blanket, an empty box of .38-caliber ammunition, receipt for a Mossberg shotgun (all found in the pickup truck), women's clothing, blood swabs from the metal frame of a sofa bed, shot wads on the ground outside, and other items connecting him to the murders. The police opened the pickup truck by prying

---

[2] As the People observe, the record is silent on whether defendant ever actually attempted suicide, although correctional personnel testified that defendant did hoard drugs, and that someone in prison had voiced a concern that the drugs could be used for an overdose.

off the lock and opening the camper. The police searched defendant's house and truck pursuant to a probation search condition imposed after defendant was convicted of violating Vehicle Code section 23153, subdivision (a) (felony driving under the influence (DUI) with injury) in 1990. The blanket search condition required defendant to "submit his person, property and automobile, and any object under the defendant's control, to search and seizure by any probation officer or other peace officer at any time of the day or night with or without a warrant." The officers were aware of the search condition prior to their search.[3]

Defendant contends (1) the court improperly imposed the probation search condition; (2) the condition was overbroad; (3) the police relied on the condition as a subterfuge in order to avoid the warrant requirement; (4) the police had no reasonable cause to search even with the probation condition; and (5) the police, not a probation officer, initiated the searches, making them invalid. The trial court denied the motion to suppress, concluding that the probation search condition was reasonably related to the DUI offense.

Initially, we note that defendant's challenge to the propriety of the search condition is timely because the condition was imposed before we adopted a rule requiring defendant to object to the condition at the time of sentencing or forfeit the claim. (*People v. Welch* (1993) 5 Cal.4th 228, 237 [19 Cal.Rptr.2d 520, 851 P.2d 802].) *Welch,* however, made its objection and forfeiture rule prospective in application only. (*Id.* at p. 238.) The *Welch* rule, therefore, does not apply to defendant, who received the probation condition before *Welch* was decided.

■ In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. (*People v. Ayala* (2000) 24 Cal.4th 243, 279 [99 Cal.Rptr.2d 532, 6 P.3d 193].) ■ We review the court's resolution of the factual inquiry under the deferential substantial evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review. (*Ibid.*)

Using these guidelines, we find no error. The trial court properly held that the probation search condition was reasonably related to the DUI conviction, which allowed officers to search and seize defendant's person, property, and

---

[3] We recently held that when officers conduct a warrantless search unaware of a parole search condition, the condition cannot be used to make the search valid. (*People v. Sanders* (2003) 31 Cal.4th 318, 333 [2 Cal.Rptr.3d 630, 73 P.3d 496].) That is not the case here, as the officers were aware that defendant was on probation and subject to a search condition at the time of their search.

automobile in order to protect the public. As we have held, "The level of intrusion is de minimis and the expectation of privacy greatly reduced when the subject of the search is on notice that his activities are being routinely and closely monitored. Moreover, the purpose of the search condition is to deter the commission of crimes and to protect the public, and the effectiveness of the deterrent is enhanced by the potential for random searches." (*People v. Reyes* (1998) 19 Cal.4th 743, 753 [80 Cal.Rptr.2d 734, 968 P.2d 445].)

■ We also conclude the warrantless searches here were proper. As we have held, by accepting probation, a probationer consents to the waiver of Fourth Amendment rights in order to avoid incarceration. "[A] probationer who has been granted the privilege of probation on condition that he submit at any time to a warrantless search may have no reasonable expectation of traditional Fourth Amendment protection." (*People v. Mason* (1971) 5 Cal.3d 759, 765 [97 Cal.Rptr. 302, 488 P.2d 630].) Therefore, "when defendant in order to obtain probation specifically agreed to permit at any time a warrantless search of his person, car and house, he voluntarily waived whatever claim of privacy he might otherwise have had." (*Id.* at p. 766; see also *People v. Bravo* (1987) 43 Cal.3d 600, 607 [238 Cal.Rptr. 282, 738 P.2d 336].)

The facts known to the police when they undertook the probation search provide ample support for the intrusion on defendant's privacy. Mary Cagle, who arrived on the scene of her daughter's murder shortly after the shooting, told officers that she had seen defendant driving his Ford pickup away from Karr's residence shortly before the shooting. Cagle told police that she feared defendant had shot Karr because he blamed her for their pending divorce. Officers also listened to a tape-recorded answering machine message defendant had left for Cagle shortly after he murdered Karr. In the message, defendant indicated where police could find Minnie Coombs's body. Thus, when the officers, as here, have reasonable suspicion that a probationer is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's privacy is reasonable. (See *United States v. Knights* (2001) 534 U.S. 112, 121 [151 L.Ed.2d 497, 122 S.Ct. 587].)[4]

B. *Competency Issues*

Defendant contends the trial court was required to hold a competency hearing under sections 1367 and 1368 at specific points during the proceedings: before the court accepted his guilty plea and admitted the special

---

[4] We have also rejected defendant's claim that a search conducted under a search condition is invalid if the police, rather than a probation officer, conduct the search. (See *In re Tyrell J.* (1994) 8 Cal.4th 68, 80, fn. 2 [32 Cal.Rptr.2d 33, 876 P.2d 519].) We see no reason to revisit the issue here.

circumstance allegations; before the beginning of his penalty trial; and before sentencing. He claims that at each point, the trial court was presented with substantial evidence sufficient to raise a doubt as to his mental competence and was therefore required to hold a competency hearing. As an alternative argument, defendant contends that even if substantial evidence did not support the need for a competency hearing, the cumulative effect of the evidence should have led the court, in its exercise of discretion, to order such a hearing.

■ The law on competency is well established. A defendant is presumed competent unless it is proved otherwise by a preponderance of the evidence. (§ 1369, subd. (f).) As a matter of due process, the state may not try or convict a mentally incompetent defendant. (*Drope v. Missouri* (1975) 420 U.S. 162, 172 [43 L.Ed.2d 103, 95 S.Ct. 896]; *Pate v. Robinson* (1966) 383 U.S. 375, 378 [15 L.Ed.2d 815, 86 S.Ct. 836] (*Pate*); *People v. Welch* (1999) 20 Cal.4th 701, 732 [85 Cal.Rptr.2d 203, 976 P.2d 754] (*Welch*).) Under section 1367, subdivision (a), a defendant "cannot be tried or adjudged to punishment while he is mentally incompetent." Section 1368, subdivisions (a) and (b), respectively, require the trial court to initiate proceedings in order to determine a defendant's present sanity if "a doubt arises in the mind of the judge as to the mental competence of the defendant" or "[i]f counsel informs the court that he or she believes the defendant is or may be mentally incompetent." To be competent to stand trial, defendant must have " ' "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." ' " (*Welch, supra,* 20 Cal.4th at p. 737, quoting *Dusky v. United States* (1960) 362 U.S. 402 [4 L.Ed.2d 824, 80 S.Ct. 788].)

■ If a defendant presents substantial evidence of his lack of competence and is unable to assist counsel in the conduct of a defense in a rational manner during the legal proceedings, the court must stop the proceedings and order a hearing on the competence issue. (*Pate, supra,* 383 U.S. at pp. 384–386; *People v. Pennington* (1967) 66 Cal.2d 508, 516–517 [58 Cal.Rptr. 374, 426 P.2d 942] (*Pennington*).) In this context, substantial evidence means evidence that raises a reasonable doubt about the defendant's ability to stand trial. (*People v. Frye* (1998) 18 Cal.4th 894, 951–952 [77 Cal.Rptr.2d 25, 959 P.2d 183] (*Frye*).) The substantiality of the evidence is determined when the competence issue arises at any point in the proceedings. (*Welch, supra,* 20 Cal.4th at p. 739.) ■ The court's decision whether to grant a competency hearing is reviewed under an abuse of discretion standard. (§ 1368; *Welch, supra,* 20 Cal.4th at p. 742.)

■ Substantial evidence of incompetence may arise from separate sources, including the defendant's own behavior. For example, if a psychiatrist or psychologist "who has had sufficient opportunity to examine the

accused, states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel, the substantial-evidence test is satisfied." (*Pennington, supra,* 66 Cal.2d at p. 519.) If a defendant presents merely "a litany of facts, none of which actually related to his competence at the time of sentencing to understand the nature of that proceeding or to rationally assist his counsel at that proceeding," the evidence will be inadequate to support holding a competency hearing. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1280–1281 [91 Cal.Rptr.2d 211, 989 P.2d 645].) In other words, a defendant must exhibit more than bizarre, paranoid behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel. (See *Welch, supra* 20 Cal.4th at p. 742; see also *People v. Jensen* (1954) 43 Cal.2d 572, 579 [275 P.2d 25].) We apply these legal standards to defendant's claim.

### 1. Competence to Plead Guilty or Stand Trial Prior to Penalty Trial

Defendant pleaded guilty to all charges and admitted the special circumstance allegations on August 28, 1992. Two days before defendant entered his plea, the court conferred in a closed session with trial counsel and defendant present. During the closed session, counsel told the court that defendant wanted to receive the death penalty and that after the entry of his guilty plea, defendant would seek to have the penalty imposed. Counsel informed the court that if he did not consent to defendant's proposed plea, defendant had threatened to remove him as counsel. As evidence of defendant's incompetence, counsel introduced evidence of his prior criminal activity and his erratic behavior while incarcerated, including his attacks on Deputy Dexter at the Martinez Detention Facility, and his apparent hoarding of medication for an alleged planned future suicide attempt.

After considering the evidence, the court denied the requested competency hearing and accepted defendant's guilty plea. The court observed: "I have had a chance to consider this matter both on Wednesday and again today, and consider the demeanor of the defendant, the manner in which he is approaching this. It is not an easy thing for anybody here, but the Court is finding the defendant competent. I want to make that clear. I have no reason whatsoever to question his competency to enter into this."

Defendant contends the court did not fully consider his propensity to commit violent acts or his desire to receive the death penalty when it made its competency finding. Indeed, defendant asserts that "a capital defendant whose

stated goal is lethal injection will never be in a position to assist his trial counsel in presenting a defense." Defendant contends that his "death wish," together with his past violent behavior, attempt to hoard drugs for a suicide attempt, and history of psychiatric treatment, indicated that he was incompetent and incapable of assisting in his own defense, and required the court to order an independent psychiatric evaluation before finding him competent to plead guilty.

We disagree. We have held that a defendant's preference for the death penalty and overall death wish does not alone amount to substantial evidence of incompetence or evidence requiring the court to order an independent psychiatric evaluation. (*People v. Guzman* (1988) 45 Cal.3d 915, 963–965 [248 Cal.Rptr. 467, 755 P.2d 917].) We have also held that a defendant's testimony as to his preference for the death penalty does not render the ensuing death judgment constitutionally unreliable. (*People v. Nakahara* (2003) 30 Cal.4th 705, 719 [134 Cal.Rptr.2d 223, 68 P.3d 1190].)

In addition, defendant's propensity for violence, hoarding of medication for an alleged suicide attempt, and history of psychiatric treatment do not indicate he was incompetent at the time he pleaded guilty. (*People v. Grant* (1988) 45 Cal.3d 829, 859 [248 Cal.Rptr. 444, 755 P.2d 894].) Thus, although defendant's prior violent acts and other bizarre behavior would lead us to agree he has violent propensities, and may even harbor a death wish, they do not raise doubts that he was incapable of assisting in his own defense or otherwise competent to plead guilty, admit the special circumstance allegations against him, or stand trial. (*Ibid.*)

We also reject defendant's claim that the trial court improperly relied exclusively upon defendant's demeanor during court appearances in order to determine his competency and should have ordered a psychiatric evaluation prior to finding him competent. Although a court may not rely solely on its observations of a defendant in the courtroom if there is substantial evidence of incompetence, the court's observations and objective opinion do become important when no substantial evidence exists that the defendant is less than competent to plead guilty or stand trial. (See *People v. Castro* (2000) 78 Cal.App.4th 1402, 1416 [93 Cal.Rptr.2d 770].) Here, the court specifically stated that in its discretion and under all the evidence, including, but not limited to, observations of defendant's demeanor, it had "no reason whatsoever to question [defendant's] competence to enter into [the guilty plea]." When a defendant has not presented substantial evidence to indicate he was incompetent, and the court's declaration of a doubt is therefore discretionary, its brief reference to the defendant's demeanor is not error. (See, e.g., *Pate, supra,* 383 U.S. at pp. 385–386; *Welch, supra,* 20 Cal.4th at pp. 741–742.)

## 2. *Competence During Penalty Phase and Before Sentencing*

Defendant claims that even if the evidence was insufficient to require a suspension of the criminal proceedings before his guilty plea and commencement of trial, additional evidence surfaced during the penalty trial and before sentencing that required the court to order a competency hearing. Specifically, defendant points to the fact that penalty phase testimony indicated he was physically abused by his mother from the time he was an infant. The childhood abuse led to his violent behavior as a young adult, such as kicking in the front door of former girlfriend Mowery, threatening her with a butcher knife, and later shooting her. He also gave a pretrial interview to a news reporter, implying that he would kill again if crossed.

In addition, as noted (*ante,* p. 504), Dr. Kormos, a board-certified psychiatrist, testified as a defense witness that defendant suffered from paranoid personality disorder. Dr. Kormos added that the paranoid condition is not episodic; it differs from a true psychosis because the sufferer never loses touch with reality.

Defendant contends that Dr. Kormos's testimony "should have alerted the trial court that defendant's pursuit of a death sentence was the product of mental illness and not a rational choice. Dr. Kormos's testimony made clear, or at least provided substantial evidence to suspect, that [defendant's] mental illness, his paranoid personality disorder, precluded him from assisting in his defense, since any rational defense would have to concede that the homicides were unjustified and inevitably suggest that there was something wrong with defendant's view that when lines are crossed or rules are violated, the threatened consequences must be meted out. In effect, [defendant's] desire to receive the death penalty is perfectly in keeping with his mental illness. To defend himself and defend his life would be to admit that what he did was wrong." Defendant lists 18 examples from Dr. Kormos's testimony that "would have alerted" the trial court to defendant's incompetence, including the evidence of defendant's attack on Deputy Dexter, his attempt to kill Mowery, and his statements to the reporter.

Defendant claims that the evidence presented at the penalty phase was a "changed circumstance" or " 'new evidence casting a serious doubt' " on his competency. (See *People v. Jones* (1997) 15 Cal.4th 119, 149-150 [61 Cal.Rptr.2d 386, 931 P.2d 960].) The evidence, defendant contends, required the trial court to suspend proceedings and hold a competency hearing under section 1368.

We disagree. Dr. Kormos testified that although defendant suffered from a paranoid personality disorder, that disorder did not render him

mentally incompetent to understand the proceedings or assist the defense in any way. The evidence defendant presented at the penalty trial did indicate that defendant lived by his own set of rules and acted without regard for the lives of others. That defendant lived by his own code of conduct neither indicates he was mentally incompetent and could not understand the penalty proceedings, nor presents any new evidence or changed circumstance that would require the court to suspend the proceedings. As the People observe, the focus of the penalty phase is to determine whether the death penalty should be imposed on a defendant who has been determined death eligible as a result of the findings and verdict reached at the guilt phase. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1266–1267 [74 Cal.Rptr.2d 212, 954 P.2d 475].) Although defendant's mental capacity and his lack of remorse may have been factors the defense wanted the jury to consider in its penalty determination, the record fails to indicate that defendant could not understand the proceedings or otherwise assist in his defense. Thus, the trial court did not abuse its discretion in failing to conduct a competency hearing during the penalty phase of the proceedings. (*Welch, supra,* 20 Cal.4th at pp. 739–740 [no abuse of discretion in court's failure to hold competency hearing when defendant shows sufficient present ability to consult lawyer and rational and factual understanding of proceedings against him].)

### C. *Penalty Trial Issues*

#### 1. *Jury Selection: Adequacy of Voir Dire of Prospective Jurors*

The trial court conducted voir dire under Code of Civil Procedure former section 223, which, at the time of defendant's trial, provided that in a criminal case the court "shall conduct the examination of prospective jurors," but that the parties "upon a showing of good cause" may "supplement the examination." (As added by Prop. 115, approved by voters June 5, 1990.) The court permitted the parties to prepare a detailed jury questionnaire designed to streamline the voir dire process. The court also privately questioned individual prospective jurors, when it believed that sequestered questioning was necessary. Defendant now makes several claims regarding the voir dire. We address each claim separately.

##### a. *Constitutionality of Code of Civil Procedure section 223*

Before the penalty phase, the defendant filed a motion asking the court to permit counsel to conduct voir dire in a manner similar to that used in civil cases under Code of Civil Procedure section 222.5, rather than the voir dire process used in criminal cases, including death penalty matters, under Code of Civil Procedure former section 223 (as added by Prop. 115, approved by voters June 5, 1990). The prosecution filed a short opposition and the court denied the motion.

Defendant's motion attacked, on equal protection grounds, the constitutionality of Code of Civil Procedure section 223, as enacted in 1990 as a part of Proposition 115. The statute, both as enacted and at present, provides that in all criminal cases, including those involving the death penalty, the trial court shall conduct the voir dire of "any prospective jurors . . . , where practicable, . . . in the presence of other" prospective jurors. (Code Civ. Proc., § 223; see *People v. Waidla* (2000) 22 Cal.4th 690, 713 [94 Cal.Rptr.2d 396, 996 P.2d 46] (*Waidla*).) As *Waidla* observed, the change in voir dire procedure abrogated prior law which had required individual and sequestered voir dire in capital cases. (*Waidla, supra,* 22 Cal.4th at p. 713; *Covarrubias v. Superior Court* (1998) 60 Cal.App.4th 1168 [71 Cal.Rptr.2d 91] (*Covarrubias*) [section 223 abrogated former individual voir dire procedure required under *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]].)

Defendant's contention rests on his belief that this provision of Code of Civil Procedure former section 223 unfairly places the voir dire in the hands of the court, and allows counsel to ask questions on a showing of good cause only.[5] By contrast, defendant observes, Code of Civil Procedure section 222.5 gives counsel in a civil action the right to examine, by oral and direct questioning, prospective jurors. The difference between civil and criminal case voir dire, defendant claims, denied him equal protection under the state and federal Constitutions.

We conclude, as the Courts of Appeal have, that Code of Civil Procedure former section 223 did not violate the equal protection clauses of the United States and California Constitutions, and reject defendant's claim that his equal protection challenge is subject to the strict scrutiny doctrine, which is applicable when there is a significant interference with the exercise of a fundamental right. (*Lucas v. Superior Court* (1988) 203 Cal.App.3d 733, 738 [250 Cal.Rptr. 76].)

The right to voir dire the jury is not constitutional, but is a means to achieve the end of an impartial jury. (*People v. Estorga* (1928) 206 Cal. 81, 84 [273 P. 575].) In addition, "the peremptory challenge is not a constitutional necessity but a statutory privilege." (*People v. Wheeler* (1978) 22 Cal.3d 258, 281, fn. 28 [148 Cal.Rptr. 890, 583 P.2d 748].) Therefore, "there is no constitutional right to any particular manner of conducting the voir dire and selecting a jury so long as such limitations as are recognized by the settled principles of criminal law to be essential in securing impartial juries are not transgressed." (*People v. Boulerice* (1992) 5 Cal.App.4th 463, 474 [7 Cal.Rptr.2d 279] (*Boulerice*).)

---

[5] Although not applicable to the present matter, we do note that in 2000 the Legislature amended Code of Civil Procedure section 223 in order to allow counsel in criminal cases to question prospective jurors without a good cause showing. (Stats. 2000, ch. 192, § 1.)

 Federal and state courts have held, however, that the Legislature may establish reasonable regulations or conditions on the right to a jury trial as long as the essential elements of a jury trial are preserved, including number of jurors (12), unanimity, and impartiality. (*Boulerice, supra,* 5 Cal.App.4th at p. 474.) The purpose of Code of Civil Procedure former section 223 was to curb commonly known abuses during the voir dire process in criminal cases. (*Boulerice, supra,* 5 Cal.App.4th at p. 474.)

As the People observe, therefore, the statute's distinction between criminal and civil voir dire is constitutional as long as it is rationally related to a legitimate state purpose under the rational relationship test, a test met here. (*People v. Leung* (1992) 5 Cal.App.4th 482, 496 [7 Cal.Rptr.2d 290].) By enacting Code of Civil Procedure section 223, the voters sought to prevent abuse of the jury selection process in criminal cases. Prevention of abuse of a statutory right is a legitimate purpose, and the voters' action was aimed at achieving a legitimate purpose rationally related to the distinction made by the law. (*Leung, supra,* 5 Cal.App.4th at p. 496.) Because the classification drawn by Code of Civil Procedure former section 223 was rationally related to a legitimate state purpose, it did not deny defendant his equal protection rights under the California and United States Constitutions. (*Leung, supra,* 5 Cal.App.4th at p. 496.)

b. *Abuse of discretion in allowing group voir dire*

 Defendant next contends the trial court abused its discretion because it conducted group voir dire under Code of Civil Procedure former section 223, and did not use its discretion to engage in sequestered and individual voir dire as also allowed under the statute.[6] Section 223 requires that voir dire of any prospective jurors must, "where practicable," occur in the presence of other jurors, and applies "in all criminal cases, including death penalty cases." Under Code of Civil Procedure section 223, sequestration is left to the trial court's discretion, based on the court's determination that it is practicable to conduct voir dire in the presence of other prospective jurors. (*Covarrubias, supra,* 60 Cal.App.4th at p. 1172.)

In support of his claim, defendant includes two affidavits, one from retired Superior Court Judge Norman Spellberg, and one from jury consultant

---

[6] The People initially assert that defendant forfeited his objections to the trial court's group voir dire because defense counsel only complained about the pace at which voir dire would proceed and requested that voir dire should be conducted in private. Because defendant's claim involves voir dire generally through the question of practicability, we conclude defendant adequately preserved the question on appeal. (See *People v. Saunders* (1993) 5 Cal.4th 580, 590 [20 Cal.Rptr.2d 638, 853 P.2d 1093] (*Saunders*) [general waiver doctrine encourages defendants to bring potential claim of error to trial court's attention].)

Therese Waller, a psychologist and staff member of the National Jury Project. In the affidavits, the jury selection experts give their opinions on the potentially unfair effect of the statutory voir dire procedures, including the apprehension prospective jurors may feel when voir dire is conducted in the presence of other prospective jurors.

Although the court did indicate that group voir dire would save time and was convenient, given the courtroom size (and its inability to accommodate all prospective jurors at once), it did not, defendant contends, appropriately weigh the fact that the prospective jurors had been exposed to substantial pretrial publicity and another venire person's experience with an unsolved murder, both of which could desensitize the panel to its task of determining the appropriate penalty. In review of potential error under Code of Civil Procedure section 223, we apply the abuse of discretion review standard to the trial court's denial of defendant's request to conduct individual voir dire of prospective jurors. (*Waidla, supra,* 22 Cal.4th at pp. 713–714.)

In considering defense counsel's claim that "every question of every juror should be outside the presence of the other jurors," the trial court expressly stated that it had discretion to order individual and sequestered voir dire if group voir dire was impracticable. The court specifically permitted the parties to prepare a jury questionnaire designed to streamline the voir dire process and to ensure that the pretrial publicity did not taint or bias the jurors' view of the case. The court admonished the jurors not to read any newspaper articles about the case and, even though some jurors did later read accounts of the trial, nothing suggests that the voir dire process was responsible for their actions. The court also offered to permit defense counsel to conduct private questioning of particular jurors when necessary and, in order to ensure the panel was impartial, conduct in-depth questioning of jurors who indicated they strongly believed in capital punishment.

Nor do the declarations discussed above assist defendant's argument. The declarations are general in character and do not point to problems in this case. In addition, the declarations do not undermine the constitutionality of Code of Civil Procedure section 223. The trial court's approach to group voir dire, and its thoughtful questioning on specific points, were reasonable, and we find no abuse of discretion in the court's conduct. (See *People v. Box* (2000) 23 Cal.4th 1153, 1180–1181 [99 Cal.Rptr.2d 69, 5 P.3d 130] [trial court's reasonable approach to group voir dire upheld].)

c. *Questioning of Prospective Juror C.*

The trial court excused for cause a prospective juror who indicated on her questionnaire that a friend of hers had been murdered. She gave a detailed

account of the murder, and the court ascertained that she could not be fair and impartial. Another prospective juror who did not serve on the panel mentioned that the first juror's story had influenced him. Defendant now claims that the prospective juror who was excused should have been questioned in private, and the court should have delivered a curative admonition to the other prospective jurors.

Defendant forfeited his right to raise any error because he never asked the court to question privately the prospective juror whose friend had been murdered and did not request an admonition for the remaining panel members. (*People v. Sanchez* (1995) 12 Cal.4th 1, 61–62 [47 Cal.Rptr.2d 843, 906 P.2d 1129] (*Sanchez*) [failure to object to court's questioning of prospective juror during voir dire forfeits claim].) On the merits, we find the trial court's careful questioning of the panel ensured the removal of the first prospective juror, and there is no indication that the second prospective juror's remarks that he was influenced by the account of the unrelated murder affected the other prospective jurors or undermined the court's ability to empanel a fair and impartial jury. (*People v. Martinez* (1991) 228 Cal.App.3d 1456, 1465–1467 [279 Cal.Rptr. 858] [using totality of circumstances test to evaluate effect of juror's remark on other prospective jurors].)

### d. *Prospective juror exposure to media and gender bias*

Defendant next complains that he was denied his Sixth Amendment right to a fair and unbiased jury because the court refused to remove jurors who were exposed to the media and who were sensitive to issues involving gender bias. (See *People v. Earp* (1999) 20 Cal.4th 826, 852–853 [85 Cal.Rptr.2d 857, 978 P.2d 15] [trial court must conduct adequate voir dire to ensure defendant's constitutional right to an impartial jury].)

Initially, we note that defendant has forfeited the right to raise any alleged error because he failed to object on either basis during trial. (*Sanchez, supra,* 12 Cal.4th at pp. 61–62.) Even on the merits, we would reject the claims. The jury questionnaire that the parties provided the court fully explored potential media bias and whether the jurors could avoid media exposure. The questionnaire also probed the effect of media exposure on the panel and satisfied the court that the voir dire adequately probed the media question.

In addition, the trial court supplemented the questionnaire with follow-up questioning on potential media exposure. For example, the court's discussion with Prospective Juror C. about the potential media influence on her views of the case proceeded as follows:

"[Court] Now that you have sat through this process before, do you feel you have heard something about the case, or heard something about the case beyond what is in this questionnaire answer?

"[Juror C.] I remember reading a little bit about the—it, when it happened.

"[Court] Would you be able to set aside what you might have read about it, and decide this case based on the evidence—

"[Juror C.] Yes.

"[Court] Received here?

"[Juror C.] Yes, I can.

"[Court] You heard the questions I have asked other jurors that may have read something about this. It is important that this case be decided with a fresh mind, based only on evidence that appears here in the courtroom.

"[Juror C.] Um-hum, yes.

"[Court] Okay. Even though you may have some vague recollection about reading something, the case can not be based on that. Would you be able to set that aside and listen to the evidence here?

"[Juror C.] Yes, I can."

The above colloquy is typical of the trial court's follow-up voir dire on media exposure, and adequately explored the potential for prejudice. After reviewing the entire voir dire of all prospective jurors, we are satisfied that the inquiry into possible media bias was adequate under the Sixth Amendment. We find no error here.

Defendant's additional claim that gender bias was not fully explored on voir dire is also without merit. First, defendant failed to preserve the issue by timely objection. (*Sanchez, supra,* 12 Cal.4th at pp. 61–62.) In addition, his claim that gender bias caused him to commit the murders is without merit. The jury had ample evidence that defendant's violent acts were not gender specific, and that his prior criminal activity included several acts of violence against men. For example, defendant committed acts of violence against male jail and prison personnel and threatened to harm male acquaintances, including Jess Martin, Mary Cagle's boyfriend. In addition, the fact that the jury may have been exposed to a newspaper article discussing defendant's apparent disdain for women serving in combat does not make his gender bias defense claim any more credible, and his attempt to blame Cagle for "inciting" his murder spree is nothing more than an attempt to refuse to take responsibility for the brutal murders. Because the case did not involve a credible gender bias claim, no need arose for the additional voir dire questioning on the subject.

e. *Other voir dire related claims*

Defendant also claims that the court inadequately conducted follow-up questioning of another prospective juror who was excused for cause because she strongly believed she could not impose the death penalty. The record is devoid of any objection from defendant or any question offered by defendant in an attempt to rehabilitate the juror, indicating defendant forfeited his right to raise the claim. In addition, as the record shows, the court's questioning of that juror revealed significant bias against the death penalty. She indicated she could never vote to impose the penalty, regardless of the evidence, and repeated similar sentiments when the court's questioning continued. Given the prospective juror's adamant bias against imposing the death penalty, we find no error in the removal for cause.

Defendant's claim that the prosecutor improperly exercised peremptory challenges to remove prospective jurors who opposed the death penalty or were neutral to the penalty has been considered and rejected in other cases. (See, e.g., *People v. Pinholster* (1992) 1 Cal.4th 865, 912 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People v. Ashmus* (1991) 54 Cal.3d 932, 967–968 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

2. *Alleged Juror Misconduct*

Defendant makes specific claims of error involving separate instances of juror misconduct during the penalty trial. We address the contentions seriatim. As to all claims, we find that even if misconduct did occur, it was not prejudicial.

a. *Reading of newspaper articles*

The jury commenced deliberation on Monday, November 9, 1992. After less than two hours, it recessed until the next morning. The jury then deliberated all that day, making several requests for clarification of legal issues and reading of testimony. The jury next deliberated on November 12. That day, the court received a note from the jury foreperson: "We are having great difficulty in reaching a unanimous decision. We would like further instruction on how to proceed." After discussion, the jury agreed to return the next day and attempt to resolve its differences.

On Friday, November 13, at 2:30 p.m., the jury sent another note to the court: "We can go no further. We are not unanimous in our decision." Before the court could act on the note, the jury sent another one at 2:55 p.m., stating: "Upon further discussion, we have decided to take one last vote on Monday morning." On Monday, November 16, the jury returned a verdict of death.

On December 22, defendant moved for a new trial. He alleged that a juror had read newspaper articles about the case during the trial and that two other jurors had considered an article before rendering the verdict. Jury Foreman M.G., in a supplemental declaration, identified the juror who said she had read articles about the case during trial as Juror R.D. Juror M.G. was "reasonably certain" that some jurors had discussed the article on November 16, before reaching the verdict, namely, Juror M.B. and either Juror S.S. or Juror P.B. The foreman also stated: "I am reasonably certain that it was Juror S.S. who pulled the newspaper article out of her purse."[7]

These jurors submitted counterdeclarations. Juror R.D. denied reading any articles during the trial or deliberations. "I never told anyone that I was reading articles about the case during the trial." Juror M.B. also denied reading any articles. She did state that after the jury was discharged, she heard someone (she could not remember who) mention one article. Juror S.S. also stated that she had not read any newspaper articles or heard Juror P.B. discuss the weekend article in the jury deliberation room on November 16.

Juror S.S. did describe what occurred in a restaurant when the jury gathered *after* rendering the verdict: "After the verdict had been reached on Monday, November 16, the jury was waiting to be called into the courtroom. Juror B.T. pulled a folded newspaper out of her purse. She stated someone had given her the paper, but she had not read it. [¶] I told [B.T.] I would like to read the article. [B.T.] handed me the folded paper and I put it in my purse. I did not read it at that time. [¶] After the verdicts were read, and the jury dismissed, many jurors met for breakfast. [¶] At the restaurant, I remembered the newspaper in my purse. I took the paper out and read the Saturday, November 14 article at that time."

Juror L.S. also filed a declaration stating she did not read any newspaper articles during the trial or deliberations. She did note that after the jurors had reached a verdict and were waiting to be called into the courtroom, Juror M.B. pulled an article about the case out of her purse that a coworker had

---

[7] Juror M.G.'s supplemental declaration contained several other comments, including additional references to juror misconduct. "During the course of deliberations in this case, the content of newspaper articles was never discussed by the jury, as far as I can recall." The one juror who, until the final vote, held out for life imprisonment, never mentioned the newspaper articles during the trial, and there is no evidence to suggest that the articles allegedly read by other jurors influenced the holdout juror's eventual willingness to impose the death penalty. Defendant contends that this portion of the supplemental declaration must be ignored because it violates Evidence Code section 1150's prohibition against allowing a court to consider a juror's mental processes in reaching the verdict. We do not find, however, the testimony of the juror holdout to be anything other than a statement of an objective fact, and it does not concern the mental processes by which the verdict was determined. (See *People v. Steele* (2002) 27 Cal.4th 1230, 1261 [120 Cal.Rptr.2d 432, 47 P.3d 225].)

given her sometime over the weekend. Juror L.S. interrupted and advised Juror M.B. not to discuss the article.

The new trial motion was argued on January 8, 1993. The court found that under a preponderance of the evidence "the defense has shown misconduct, in that the articles may have been read during the course of this trial." The court summarized the content of the articles, and concluded that in general, they consisted of neutral summaries of the trial events. In finding misconduct, the court never identified which incident or article influenced its conclusion. The court simply stated: "I feel that by a preponderance of the evidence that the defense has shown misconduct, in that articles may have been read during the course of this trial." The objective nature of the articles, and their seemingly innocuous content, however, led the court to conclude that defendant had not been prejudiced, even assuming the jurors read them. The court also noted that "[t]his was also a case in which the facts really were not in dispute." After assessing the entire case record, and determining the jury was conscientious, the court denied defendant's motion for a new trial.

### b. *General legal principles*

■ Juror misconduct involving the receipt of extraneous information about a party or the case that was not part of the evidence received at trial creates a presumption that the defendant was prejudiced by the evidence and may establish juror bias. (*People v. Nesler* (1997) 16 Cal.4th 561, 578 [66 Cal.Rptr.2d 454, 941 P.2d 87].) This is because "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it." (*Smith v. Phillips* (1982) 455 U.S. 209, 217 [71 L.Ed.2d 78, 102 S.Ct. 940].) When, as here, the jury receives the evidence from an outside source, the verdict is set aside if there is a "substantial likelihood" of juror bias. (*Nesler, supra,* 16 Cal.4th at p. 578.) Defendant may establish bias if (1) the extraneous material, judged objectively, "is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror" (*id.* at pp. 578–579) or (2) from the nature of the misconduct and surrounding circumstances, it is substantially likely a juror "was 'actually biased' " against the defendant. (*Ibid.*) Because it is impossible to shield jurors from every contact that may influence their vote, courts tolerate some imperfection short of actual bias. (*In re Hamilton* (1999) 20 Cal.4th 273, 296 [84 Cal.Rptr.2d 403, 975 P.2d 600] (*Hamilton*).)

As noted, although the trial court determined that misconduct did occur, it concluded that any misconduct was not prejudicial because it did not influence the jurors to the defendant's detriment. The court relied on Juror M.G.'s initial declaration specifying two possible times when jurors could have been exposed to information from an extraneous source. First, Juror

M.G. accused Juror R.D. of informing him, during deliberations, that he had read "all of the articles that have come out" during the proceedings. Although Juror R.D. later denied reading the articles, the court resolved the apparent conflict between her declaration and Juror M.G.'s comments in defendant's favor.

In addition, Juror M.G. accused Jurors M.B. and S.S. of discussing an article, following their sentencing vote, "in a way that indicated that each of them had read the article prior to taking their final vote." As the People observe, Juror L.S.'s counterdeclaration absolved Juror M.B, and Juror S.S.'s counterdeclaration absolved Juror P.B. The court resolved the conflicting declarations in defendant's favor, after weighing all the evidence.

An appellate court will accept the trial court's determinations and findings on questions of historical fact if they are supported by substantial evidence. (*In re Carpenter* (1995) 9 Cal.4th 634, 646 [38 Cal.Rptr.2d 665, 889 P.2d 985] (*Carpenter*).) Because we find the evidence supporting defendant's allegations close, we agree with the trial court's finding of misconduct. The question whether the misconduct was prejudicial is a mixed one of law and fact, and is subject to an appellate court's independent determination. (*Id.* at pp. 658–659.) Keeping these principles in mind, we review the trial court's finding that the articles, even if read, were not prejudicial.

### c. *Prejudice analysis*

Defendant contends that each of the articles "skews and telescopes" the evidence and testimony presented toward the rendering of a verdict of death. He complains that the articles were "inherently prejudicial," and the fact that several jurors were aware of them and filed dishonest affidavits in response to the court's questions regarding their reading of the articles, should have led the trial court to grant his new trial motion.

Defendant initially discussed two separate articles appearing October 27, 1992, and November 14, 1992. The first article reported on Mary Cagle's testimony, and is objective and contained no information the jurors did not hear themselves in the courtroom. Nothing in the article's description of Cagle's testimony harbored the potential for influencing a juror who might read it. (See *Hamilton, supra,* 20 Cal.4th at p. 301, fn. 21.)

The second article described defendant's behavior while listening to the tape of his threats to Cagle. Defendant complains that the article reports that while listening to the tape, he was "slightly smiling," "tapping his fingers," and "stroking his beard." As the People point out, however, the article describes a momentary change in facial expression, nothing else. Defendant

fails to note that the jurors observed, firsthand, his change of expression, and it is doubtful that his brief change in expression influenced the jury's overall impression of the defendant. Although the article briefly referred to the fact that defendant did not believe women should engage in combat, the jury was already aware of defendant's views on women and combat. We find no substantial likelihood that the article influenced the jury negatively.

Two additional newspaper articles, printed on October 23, and November 10, 1992, described the opening and closing arguments. Defendant claims the summaries focused on his violent past, and contained gruesome details of his murders, but so did the arguments. The articles contained nothing significant that the jury did not hear themselves. They contained no extraneous information. We conclude the trial court correctly found that the information they disclosed was not prejudicial.

Other articles reporting on defendant's statement that he believed he would be sentenced to death, and reporting the events at trial, were evenhanded in their discussions and noninflammatory. No evidence exists that any of the jurors read these articles, and even if they did, there is no evidence the jurors exposed to the articles discussed the information with the other jurors. (*Hamilton, supra,* 20 Cal.4th at p. 301, fn. 21.) We have held that reading a newspaper account of the trial is not sufficient to create a substantial likelihood of prejudice, and we find none here. (*Ibid.*; *Carpenter, supra,* 9 Cal.4th at pp. 656–657.)

Defendant's remaining complaint about the trial court's no-prejudice finding is that the court failed to hold an evidentiary hearing "to resolve any conflicts that required resolution and to permit counsel to elicit further details relevant to the issue of prejudice." The details defendant seeks "existed in all of the jurors' declarations submitted in defendant's motion for a new trial and the prosecution's opposition to the motion."

As the People observe, although defendant's initial showing satisfied the evidentiary standard for proving that misconduct occurred, it was insufficient to require the trial court to conduct an evidentiary hearing. The court gave defendant the benefit of the doubt in interpreting the statements made in the declarations in favor of finding misconduct, and conducting an evidentiary hearing would not have changed the misconduct finding.

In addition, the evidence supporting the death verdict was overwhelming. Defendant pleaded guilty to the murders and admitted the special circumstance allegations. The proof of his prior violent acts was extensive, and there was no evidence that any offending juror discussed the newspaper articles with any innocent juror. (*Hamilton, supra,* 20 Cal.4th at p. 301, fn. 21.) We

find no reason to overturn the trial court's finding that the jurors' exposure to newspaper articles reporting on defendant's trial did not prejudice the verdict.

### 3. Juror's Request to Speak with Defendant

After the defense completed its case on November 5, 1992, the trial court excused the jury until Monday morning, November 9, for final arguments. Once the jurors left the courtroom, the court revealed to counsel that Juror M.B. had sent it a note earlier that afternoon that stated: "I would like to talk to the defendant at the close of trial in the presence of the attorney and Your Honor." Asked to explain the note, the juror indicated "it has nothing to do with me, as a juror." The juror also told the court that her inquiry was related to her work as a missionary, and that she "would just like to talk to [defendant], person to person, and maybe say a prayer with him." Juror M.B. also revealed that Jurors S.S. and R.D. had expressed the same desire to meet with defendant, although the jurors had not discussed the case among themselves. "[T]his was just a question that was brought up: Was it ever permissible for the jurors to talk to the defendant after the trial was over?" During the discussion, defense counsel never objected to Juror M.B.'s request, but stated that "I think we need to get together and work out a specific question to ask each of them. Because the one that you said here about the moral or humanitarian, it could kind of impinge on what they are told in the instruction. There might be some divergence there. I think we have to be extremely careful of our words." Before leaving the courtroom, Juror M.B. told the court that she promised to follow the court's directions about how to evaluate the case.

The following Monday, the trial court questioned Jurors R.D. and S.S. Juror R.D. indicated she simply wondered whether jurors could say "hi" to defendant. Juror S.S. stated she had been a bystander when the discussion about communication with defendant occurred, and she did not desire to speak with him.

Defendant contends "that the manner in which the trial court conducted its bias inquiry of Juror M.B. compromised the juror's ability to be impartial and rendered her unable to fulfill her juror duties." He claims that the court's questioning effectively nullified any sympathy she may have felt toward defendant by alerting her to the fact that her note may have compromised her ability to impose the death penalty.

By failing to object, defendant forfeited his claim. (Evid. Code, § 353; see *Saunders, supra,* 5 Cal.4th at pp. 589–592.) We also find the claim lacks merit. Nothing indicates that Juror M.B.'s note contained information that "jurors had commenced their deliberations or had formed any tentative

conclusions regarding the appropriate penalty." (*People v. Anderson* (1990) 52 Cal.3d 453, 481 [276 Cal.Rptr. 356, 801 P.2d 1107].) The note indicated the juror was concerned only with defendant's spiritual well-being. Because the note did not raise the possibility of juror misconduct, the court had no duty to conduct an inquiry into the juror's motives. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1117 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

### 4. *Shield Law Claim*

#### a. *Facts*

Following defendant's arrest, William Hutchinson, a reporter for the Antioch Daily Ledger-Post Dispatch, interviewed defendant about the charges pending against him. On March 12, 1991, the newspaper published the interview, entitled *I'll Get Death Penalty*. (Hutchinson, *I'll Get Death Penalty*, Antioch Daily Ledger-Post Dispatch (Mar. 12, 1991), p. 1.) According to Hutchinson, defendant told him that he expected to be convicted of the crimes, and " 'I figure they will find me guilty because they've got a lot of evidence against me.' " (*Id.* at p. 1.) The article also quoted defendant as saying, " 'I figure I'll get the death penalty. I knew that before any of this happened. But like I said, I weighed all that before I did anything.' " He also commented that " 'if you push my button, then whatever happens, happens.' " (*Id.* at p. 12.)

Prior to the penalty trial, the prosecution subpoenaed Hutchinson as a witness. Hutchinson and the newspaper filed a motion to quash the subpoena, on the ground that the information the prosecution sought was protected by the California shield law (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070). The shield law, as explained further below, provides newspersons, including reporters who are engaged in legitimate journalistic pursuits, protection against compulsory disclosure of the information they acquire in gathering news. (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934] (*Delaney*); Cal. Const., art. I, § 2, subd. (b) [repeats language of Evid. Code, § 1070 immunity and elevates protection to constitutional status]; Evid. Code, § 1070 [immunity applies to any unpublished information obtained in gathering, receiving, or processing information for communication to public].)

A hearing on the motion to quash was held on October 27, 1991. The prosecutor told the court that "all the People would seek to elicit from Mr. Hutchinson is an affirmation as to whether or not [defendant] made certain statements which are attributed to him in the article." The prosecution noted that it did not seek any unpublished information or Hutchinson's notes.

The prosecutor then asked Hutchinson whether defendant had made the comments attributed to him in the March 12 article. Hutchinson replied that

although he could not remember exactly what defendant told him during the interview, "at the time I wrote it, I believed it to be accurate." Defense counsel then moved to strike Hutchinson's proposed testimony "[o]n the grounds I can't adequately cross-examine him."

The court stated that Hutchinson's testimony would be allowed, but that it was concerned with defendant's cross-examination rights. When asked to identify areas of potential cross-examination, defense counsel replied, "I want to know every single thing about this conversation from start to finish. If he had a tape recording of it, that would be great. If he doesn't, then I want to elicit as much information as I can get; short of there being some recording of every single statement that was made, every question that was asked."

The court continued the hearing after learning that Hutchinson had not taped the interview. Defense counsel objected to any in camera hearings that counsel could not attend, commenting, "I am asserting now that this Court can not, in any way, shape or form make a decision about what's useful to the defense in this case, Your Honor. It's too complicated a defense."

The court then granted defendant's request for an in camera hearing, with defendant and his counsel present. The court conducted the in camera hearing without the prosecutor, in order to explore what would assist in defendant's cross-examination. Defendant told the court that he sought Hutchinson's notes "and the following information: (1) The context of [defendant's] statements; (2) the flow of conversation; (3) the specific words [defendant] used; (4) the intensity of [defendant's] voice; (5) how long [defendant] spoke about matters which in his mind justified his action without interruption; (6) whether [defendant] presented his justifications logically; and (7) whether [defendant] evidenced a strong belief in what he was saying."

The court next held an in camera hearing with Hutchinson, his attorneys, the prosecutor, and defense counsel present. During the hearing, Hutchinson indicated he had no independent recollection of the interview, except the information provided in his notes. The notes indicated that defendant made the reported statements to Hutchinson, appeared calm and spoke in a monotone, discussed very seriously his life philosophy, did not appear delusional, presented his arguments logically, and believed what he was saying.

The court determined that on the basis of Hutchinson's in camera testimony, it would allow the defense to cross-examine Hutchinson on his observations of defendant's demeanor, mental status, and the manner in which defendant answered questions. Hutchinson's notes would not be produced.

The court allowed the defense to question Hutchinson outside the jury's presence in order to determine the scope of his potential trial testimony and

whether he would rely on the shield law. Hutchinson invoked the shield law as to all questions regarding defendant's demeanor during the interview. The trial court found the reporter in contempt for his refusal to answer the questions initially. The court suggested that Hutchinson answer the questions that were covered in the protected notes "independent of the notes." Hutchinson eventually spoke on the length of his interview with defendant and whether defendant smiled. The trial court then discharged the contempt citation.

During trial, Hutchinson testified for the prosecution (with the jury present) that he had written the March 12 article a day or so after interviewing defendant. He noted that defendant "is not a man who does things impulsively and he thinks beforehand of the consequences of his actions." According to Hutchinson, defendant told him: "Let's say, I consider everything before I do it. I weigh all the angles, make my decision and I go ahead and do it." Hutchinson also recalled that defendant told him in reference to the fact that he shaved his head shortly after the murders, "I wanted to change my looks. I wasn't done. I didn't intend for them to catch me for awhile." "I had some other things I wanted to do. Getting caught wasn't one of them. At least getting caught so quick wasn't part of my plan." In reference to Janice Butler, defendant told Hutchinson, "she crossed the line. I told her if she ever got between me and my wife, they'd find her body out back in Brentwood." Defendant made similar comments regarding his ex-wife, Mary Cagle, his belief that "If I draw a line and tell you not to cross that line, you've got everything coming to you if you cross it because I'm not going to draw two lines."

On cross-examination, Hutchinson testified that throughout the interview, defendant spoke in a stern voice and was calm, and that at times his eyes stared intently through the glass. Hutchinson could not recall the order in which defendant made the statements the article attributed to him, but believed that the statements, though paraphrased, were accurate. Hutchinson noted that his "definition of someone who is calm would be someone who is lucid, rational, someone who isn't jumping around or delusional," although he did acknowledge to defense counsel that a person could appear calm but be irrational at the same time. Dr. Kormos later testified that Hutchinson's account of the interview would not change his diagnosis.

b. *Failure to produce interview notes*

Defendant's principal complaint is that the trial court abused its discretion in failing to require Hutchinson to produce his interview notes and limiting his responses to describing defendant's demeanor and perceived mental state. Defendant claims the interview notes were essential to support his mental

disorder defense and necessary for his counsel to show that his statements "were said in a context and manner to validate [defendant's] psychiatric disorder and to provide evidence of a mitigating factor for the jury to consider in rendering a verdict." We disagree.

As both defendant and the People agree, the standard for determining whether a defendant may compel disclosure of information otherwise protected under the shield law was set forth in *Delaney, supra,* 50 Cal.3d 785. *Delaney* held that the law protects a reporter from contempt for refusal to disclose either unpublished information or the source of the information, whether published or unpublished. (*Id.* at pp. 796–797.) *Delaney* observed that "a newsperson's protection under the shield law must yield to a criminal · defendant's constitutional right to a fair trial when the newsperson's refusal to disclose information would unduly infringe on that right." (*Id.* at p. 793.) As we have observed in several cases, "In order to compel disclosure of information covered by the shield law, the defendant must make a threshold showing of a reasonable possibility that the information will materially assist his defense. The showing need not be detailed or specific, but it must rest on more than mere speculation." (*People v. Cooper* (1991) 53 Cal.3d 771, 820 [281 Cal.Rptr. 90, 809 P.2d 865], paraphrasing *Delaney, supra,* 50 Cal.3d at pp. 809–813; see also *Sanchez, supra,* 12 Cal.4th at p. 53.) If the threshold showing is made, the court then balances various factors in determining whether it must compel disclosure of the information. (*Delaney, supra,* 50 Cal.3d at pp. 809–813.) These factors include whether the information is confidential or sensitive, the interests that the shield law protects, the importance of the information to the defendant, and, in some cases, whether there is an alternative source for the information. (*Id.* at p. 813.)

We have observed that "[a]lthough *Delaney* did not and could not specify what evidence would meet its threshold test, the court did observe that the defendant need not prove evidence he sought to discover would lead to his exoneration and that 'the defendant's showing need not be detailed or specific, but it must rest on more than mere speculation.' " (*Sanchez, supra,* 12 Cal.4th at p. 56, quoting *Delaney, supra,* 50 Cal.3d at p. 809.) One example in capital cases where we have recognized the evidence might meet the threshold test and is necessary to a defendant's constitutional right to a fair trial is in his ability to "establish mitigating circumstances relevant to the penalty determination." (*Delaney, supra,* 50 Cal.3d at p. 809.)

Using *Delaney*'s threshold test, defendant claims Hutchinson's notes of the March 12 interview were essential to validate defendant's psychiatric disorder and provide evidence of a mitigating factor for the jury to consider in favor of a life sentence.

The evidence defendant asserts would have materially assisted his mental state defense consists of nothing more than mere speculation on his part. Defendant has made no attempt to show that the notes reveal anything different from Hutchinson's testimony, and the record does not suggest the notes contain anything of substance that the jury had not already heard. In addition, the only matters in the notes to which Hutchinson did not testify (whether defendant was promised confidentiality and the interview's duration) do not bear on defendant's mental state at the time of the murders. Dr. Kormos did testify that nothing in Hutchinson's testimony changed or contradicted his diagnosis of paranoid personality. But defendant has failed to meet *Delaney*'s threshold test, and we find no abuse of discretion in the trial court's use of the shield law in protecting Hutchinson's notes. Because defendant has not met *Delaney*'s threshold test, we need not balance the *Delaney* factors in order to determine whether disclosure is required. (*Delaney, supra,* 50 Cal.3d at p. 813.)

### c. *The in camera proceeding*

Defendant contends that the trial court's determination that nothing existed in Hutchinson's notes to materially assist his defense was the result of a constitutionally defective in camera hearing. Claiming Hutchinson's notes were "neither confidential nor sensitive," defendant asserts that the notes were essential to establishing his mental health defense because they contained the demeanor evidence the defense sought to procure to demonstrate his mental state.

Again, defendant overlooks the fact that Hutchinson did testify as to defendant's demeanor and mental state during the interview. The fact that the court held an in camera hearing to determine the extent of Hutchinson's reliance on the shield law in no way affected the gist of his later testimony as to defendant's interview demeanor.

In a related argument, defendant claims that the trial court's decision to hold an in camera hearing excluding both defendant and his counsel denied him his constitutional right to be present and to assistance of counsel. He also claims that application of the shield law denied him his right to the "entirety of the interview," thwarting his ability to present a defense and obtain a fair trial. (See Evid. Code, § 356.) Defendant again fails to show how the in camera proceeding or the protection of the unpublished notes in any way negatively influenced his ability to present a defense or receive assistance from counsel, or in any way changed his defense or the context of Hutchinson's testimony. (*Sanchez, supra,* 12 Cal.4th at p. 58.)

#### d. *Additional claims*

Defendant also claims that the failure to produce Hutchinson's interview notes denied him his right to confront and cross-examine the reporter, his right to present a defense, a fair and reliable penalty phase trial, compulsory process, and his right to effective assistance of counsel. As the facts show, Hutchinson was cross-examined on his testimony regarding the interview, and defendant does not establish that further cross-examination would have revealed additional information or otherwise influenced the jury's verdict. No evidence suggests Hutchinson's testimony prejudiced the presentation of defendant's case.

### 5. *Exclusion of Evidence*

Defendant complains that the trial court abused its discretion when it excluded evidence, and in so doing denied him his Sixth, Eighth, and Fourteenth Amendment rights to present a penalty phase defense. He specifically refers to three types of evidence: (1) the proposed testimony of prison expert James Park concerning Park's anti-death-penalty beliefs; (2) the proposed testimony of Mary Cagle's former boyfriend, Jess Martin, as to Cagle's alleged bias as a witness; and (3) Martin's proposed testimony about Cagle's alleged manipulative behavior. In each instance, defense counsel offered proof as to the evidence he sought to introduce. (See *People v. Livaditis* (1992) 2 Cal.4th 759, 778 [9 Cal.Rptr.2d 72, 831 P.2d 297] [requiring offer of proof].) We find no abuse of discretion and no violation of defendant's constitutional rights in the trial court's decision to exclude the testimony.

■ As the People observe, defendant's Sixth Amendment right to present a defense includes the right not to have the trial court interfere with a defendant's ability to receive a fair trial. ■ The Eighth and Fourteenth Amendments require the jury in a capital case to hear any relevant mitigating evidence that the defendant offers, including " 'any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " (*Frye, supra,* 18 Cal.4th at p. 1015.) In turn, the court does have the authority to exclude, as irrelevant, evidence that does not bear on the defendant's character, record, or circumstances of the offense. (*Ibid.*) "[T]he concept of relevance as it pertains to mitigation evidence is no different from the definition of relevance as the term is understood generally." (*Id.* at pp. 1015–1016.) Indeed, "excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103 [31 Cal.Rptr.2d 321, 875 P.2d 36] (*Fudge*).)

### a. *James Park's testimony*

James Park, a former correctional employee and prison condition expert, testified for the defense about defendant's likely ability to adjust well in a maximum security prison if he were sentenced to life without parole. He was asked on cross-examination whether he supported imposition of the death penalty. He replied that he did not. On redirect, defense counsel asked why he was opposed to the penalty, and the court sustained the prosecution's objection to the question, under Evidence Code section 352, finding the information irrelevant. The trial court correctly concluded that Park's views on the death penalty were irrelevant to defendant's ability to adjust to prison life or any other factor in mitigation.

### b. *Jess Martin's testimony*

During a sidebar conference outside the presence of the jury, defense counsel sought to proffer the testimony of Jess Martin, Mary Cagle's former boyfriend, (1) that Cagle asked Martin to retaliate against defendant's family after the murders, in an effort to show Cagle's testimony was biased, and (2) that Cagle was prone to manipulating men and committing welfare and other "scams" in order to get her way. The court properly excluded the evidence as irrelevant. (Evid. Code, § 352.)

Martin's proposed testimony about Cagle's behavior after the murders was cumulative and did not help further explain defendant's character, the facts of the offense, or defendant's prior record. (*Frye, supra,* 18 Cal.4th at pp. 1015–1016.) The jury had been permitted to view Cagle's record, and Dr. Kormos had testified that defendant's paranoid personality disorder was triggered in part by Cagle's manipulative tendencies. In addition, there is no indication that Cagle's alleged scams had anything to do with defendant or that defendant was even aware of her behavior when he committed the three murders. The court's exclusion of these minor or subsidiary points did not amount to an abuse of discretion. (*Fudge, supra,* 7 Cal.4th at p. 1103.)

### 6. *Alleged Instructional Errors—CALJIC No. 8.85*

The jury was given the standard instruction on aggravating and mitigating factors under CALJIC No. 8.85 and its requirement that the jury, in determining penalty, shall be guided by and "shall consider all of the evidence which has been received during any part of the trial of this case." Defendant complains that, for several reasons, the court deprived him of his right to due process and a reliable sentence when it instructed the jury as to the statutory sentencing factors. As will appear, we have repeatedly considered and rejected defendant's claims in previous opinions, and we see no reason to reconsider those decisions in light of defendant's arguments.

### a. *Argument that CALJIC No. 8.85 is misleading*

Defendant first claims the instruction is misleading because it required the jury to aggravate "the sentence upon the basis of statutory sentencing factors which, as a matter of state law, were relevant solely as mitigators." In particular, defendant complains that CALJIC No. 8.85, repeating section 190.3, factors (d) to (h), and (j), should have been deleted because it misled the jury into believing that the absence of a mitigating factor becomes a factor in aggravation and the jury would be confused by the inconsistent scheme of aggravating and mitigating factors, potentially giving greater weight to the absence of mitigating factors.

We have considered and rejected the identical contention in several recent cases, and no evidence suggests the jury was unable to properly apply the instruction. (See, e.g., *People v. Mendoza* (2000) 24 Cal.4th 130, 191 [99 Cal.Rptr.2d 485, 6 P.3d 150] (*Mendoza*); *People v. Kipp* (1998) 18 Cal.4th 349, 380–381 [75 Cal.Rptr.2d 716, 956 P.2d 1169] (*Kipp*).) In addition, the jury was also given defendant's requested supplemental instructions that limited the jurors' consideration to only those aggravating factors that actually existed: "You have been read the list of aggravating circumstances which the law allows you to consider if you find they have been established as required. These are the only aggravating circumstances that you may consider. You are not allowed to take into account any other facts or circumstances as the basis for deciding that the death penalty would be appropriate in this case." There is no indication the jury misapplied CALJIC No. 8.85, as defendant suggests.

### b. *Factors (d) and (k)*

CALJIC No. 8.85, factor (d), reflecting section 190.3, factor (d), asks the jury to consider, if applicable, "Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." Defendant complains that the court erroneously refused to modify the factor in order to inform the jury that it should consider "any mental or emotional disturbance" or delete the factor altogether so that the jury would give due weight to defendant's mental illness. The trial court also rejected defendant's request to modify the catchall factor in section 190.3, factor (k), to include 10 items described by Dr. Kormos as the possible causes of defendant's mental illness.

As the People observe, the court did not err. CALJIC No. 8.85, as given, permitted the jury to consider defendant's mental illness even though it might not have amounted to an extreme condition, and defendant is not entitled to a pinpoint instruction. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1054–1055 [95

Cal.Rptr.2d 377, 997 P.2d 1044] (*Jenkins*).) In addition, in refusing to modify the wording of section 190.3, factor (k) as reflected by CALJIC No. 8.85, factor (k), the court placed no improper limitation on mitigating evidence. Under the instruction as given, the jury could consider any circumstance that extenuated the gravity of the crime, including Dr. Kormos's testimony on the causes of defendant's mental illness. (See *Jenkins, supra,* 22 Cal.4th at p. 1055.)

### c. *Failure to instruct the jury not to double-count aggravating factors*

Defendant also complains that the court's refusal to modify CALJIC No. 8.85, factor (a), reflecting section 190.3, factor (a), the circumstance of the offense, led the jury to double-count that factor by inviting the jury to count the special circumstance he admitted twice, "once by itself, and once as a circumstance of the crime." The trial court rejected defendant's proposed alternative instruction telling the jury to "not consider an aggravating factor if you have already considered the facts surrounding it as a circumstance of the crime." He adds that the prosecutor "implicitly coaxed the jury to count the special circumstance twice."

Defendant's argument has no merit. As we held in *People v. Ayala, supra,* 24 Cal.4th at page 289, the possibility the jury would double-count the aggravating factors is remote, in the absence of prosecutorial misconduct. Here, the prosecutor's limited explicit reference to section 190.3, factor (a) was that the items under the factor "as the [c]ourt has instructed you, are all considered as one big aggravating factor." There is no reason for us to believe the prosecutor's brief reference to factor (a) in any way misled the jury.

### d. *Failure to admonish the jury*

As discussed *ante,* at pages 517–522 during the jury's first and only weekend recess after the first week of trial, several jurors might have read and shared newspaper articles about defendant's crimes. We concluded that although there may have been misconduct, it did not prejudice the verdict. Defendant also complains that the trial court's failure to admonish the jury, prior to its weekend recess, that it should not read newspapers or consult outside sources, led the jurors to read the articles related to the crimes and prejudiced the penalty verdict. (§ 1122, subd. (b) [requiring the court, at each adjournment, to admonish jury not to converse among themselves or with anyone else on any subject connected with trial].)

Initially, we note that defendant failed to object to the court's omission, and therefore forfeited the claim on appeal. (*People v. Campbell* (1976) 63

Cal.App.3d 599, 609–610 [133 Cal.Rptr. 815].) In addition, the jury was admonished several times (while receiving jury instructions, and after closing and rebuttal arguments) that it must not consult reference works or persons for additional information, must not discuss the case with any person other than a juror after the case is submitted, and must not seek or receive any evidence outside the evidence that was presented at trial. The jury was also told that the Hutchinson newspaper article, which was an exhibit in the case, was not in evidence and that "Headlines on a newspaper are not evidence." Also, as we have observed, although the jurors should not have referred to any articles about the crimes, the fact that some jurors might have been exposed to media reports did not prejudice the penalty verdict. Declarations from several jurors satisfied the court that the exposure, if any, was limited in nature, and not prejudicial to a fair verdict. Thus, although the court should have repeated the admonition not to consult outside sources prior to the final weekend recess, we do not find the omission was prejudicial. (See, e.g., *People v. Heishman* (1988) 45 Cal.3d 147, 174 [246 Cal.Rptr. 673, 753 P.2d 629] [failure to admonish jury at time of adjournment not grounds for reversal unless the defendant shows prejudice resulting from the omission].)

### 7. *Motion to Modify the Verdict*

Following the death verdict, the trial court denied defendant's motion to modify the verdict under section 190.4, subdivision (e). Defendant complains the court erred in refusing to modify the verdict by failing to consider defendant's mental illness as the causative factor for the murders and in mitigation the fact that he pleaded guilty. During the court's consideration of defendant's motion, the court observed that "I am independently reweighing the evidence, trying to determine whether the weight of the evidence supports the jury's findings and the verdict." The court then described the defense evidence in detail and what aggravating factors it deemed important. After concluding the aggravating factors outweighed mitigating ones, the court denied the modification motion.

We find the court's explanation for denying the motion sufficient. The court reasonably found the evidence of defendant's mental condition did not influence his conduct. (*Welch, supra,* 20 Cal.4th at p. 775.) It also did not accept defendant's assertion that he pleaded guilty in order to mitigate his sentence, and the court's failure to refer to that fact was not error. (See *People v. Memro* (1995) 11 Cal.4th 786, 885 [47 Cal.Rptr.2d 219, 905 P.2d 1305].)

### 8. *Constitutionality of Death Penalty*

Defendant makes familiar arguments that the 1978 death penalty scheme is unconstitutional. We have repeatedly rejected the claim that the statute does

not meaningfully narrow the class of persons eligible for the penalty. (*Mendoza, supra,* 24 Cal.4th at p. 191.)

Defendant also asserts that section 190.3, factor (a) is impermissibly vague because the phrase "circumstances of the crime" can be interpreted too broadly to encompass any fact. The United States Supreme Court has rejected the identical claim that factor (a) is unconstitutionally vague. (*Tuilaepa v. California* (1994) 512 U.S. 967, 976 [129 L.Ed.2d 750, 114 S.Ct. 2630].) This court has also found that "[t]he purpose of the sentencing selection factors set forth in section 190.3 is to guide the jury's discretion in deciding the appropriate penalty, not to distinguish a death-worthy case from one that is not." (*Mendoza, supra,* 24 Cal.4th at p. 192.)

In addition, defendant complains that the court should require the jury to make written findings or achieve unanimity as to aggravating circumstances. We have previously rejected the identical claim. (*Kipp, supra,* 18 Cal.4th at p. 381.)

Other claims defendant makes are largely repetitive of earlier claims, or have been rejected in numerous cases. We touch on his key arguments. The court need not have instructed the jury that aggravating circumstances must outweigh mitigating circumstances beyond a reasonable doubt, and jury unanimity on the findings was not required. (*Mendoza, supra,* 24 Cal.4th at p. 191.)

Intercase proportionality review is not required. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 157 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Conducting intracase proportionality review does not assist defendant's cause because the penalty is proportionate to his culpability; he committed three brutal first degree murders of defenseless victims. (See *Sanchez, supra,* 12 Cal.4th at pp. 84–85.) Use of unadjudicated criminal activity during the penalty phase does not violate due process or lead to an unreliable verdict. (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1060–1061 [90 Cal.Rptr.2d 607, 988 P.2d 531].) The presence of certain adjectives in section 190.3 ("extreme" in factor (d) and "substantial" in factor (g)) does not impermissibly limit consideration of mitigating factors in violation of the federal Constitution. (*Jenkins, supra,* 22 Cal.4th at pp. 1054–1055.) The court need not designate what mitigating factors the jury may consider as mitigating. (*People v. Carpenter, supra,* 21 Cal.4th at pp. 1063–1064.)

### 9. *International Law Claim*

Defendant's final contention is that international law compels the elimination of the death penalty. We have previously concluded, however,

that international law and treaties do not compel elimination of the death penalty in this state, when it has been rendered in accordance with state and federal constitutional and statutory requirements. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *Jenkins, supra,* 22 Cal.4th at p. 1055.)

### III. DISPOSITION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Brown, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied January 19, 2005.