Filed 6/29/15  P. v. Crump CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>STEVEN R. CRUMP,<br><br>Defendant and Appellant. | A140459<br><br>(Alameda County<br>Super. Ct. No. C166651) |

A jury convicted defendant Steven Crump of one count of criminal threats and one count of identity theft for having mailed a threatening letter signed with another person's name to a public figure.[1]  As a result of these and prior convictions, he was sentenced under the Three Strikes law to 30 years to life in prison.  On appeal, he claims the trial court improperly (1) failed to revisit whether he was mentally competent after counsel was appointed for him; (2) refused to strike a prior conviction for sentencing purposes under section 1385 and *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497; and (3) imposed a sentence that amounts to cruel and unusual punishment.[2]  We reject these claims and affirm.

---

[1] The criminal-threats conviction was under Penal Code section 422, and the identity-theft conviction was under Penal Code section 530.5, subdivision (a).  All further statutory references are to the Penal Code.

[2] After the record was filed, Crump filed a request to dismiss his appeal as abandoned, which his appellate counsel argued we should decline until Crump's competence was assessed.  We exercised our discretion to retain the appeal.  (See *People v. Nelms* (2008) 165 Cal.App.4th 1465, 1470.)

1

# I.
## FACTUAL AND PROCEDURAL
### BACKGROUND

We do not describe in detail the facts underlying the instant offenses because they are mostly immaterial to the appellate issues. But briefly, in February 2011, Crump sent a letter to the Oakland business address of a Nation of Islam minister in which he directly threatened to kill the minister and "pray[ed] for the death and destruction" of the minister and the minister's family, claiming that the minister had raped his niece. Crump signed the letter with the name of one of his professors at a college he attended. An information charged Crump with one felony count of criminal threats based on his threats to the minister and one felony count of identity theft based on his use of the professor's name without consent.

The information also alleged two prior convictions for serious felonies based on two 2005 convictions of criminal threats.[3] Both prior convictions were based on an e-mail Crump sent to a general account for District One of the Alameda County Board of Supervisors. The e-mail threatened to kill the District One supervisor, his "board members" and "staff," and the former Alameda County Sheriff.

Crump asked to represent himself in the proceedings, and his request was granted in September 2011. At a pretrial conference a few days later, Crump exhibited "out-of-control conduct," prompting the trial court to declare a doubt about his mental competence, order a hearing on his competency, and appoint counsel to represent him for that purpose. Based on reports from a psychiatrist and a psychologist, the court in December found Crump to be competent.

A month later, in January 2012, Crump had another outburst on the day trial was set to begin when the trial court indicated that it intended to appoint stand-by counsel for him. After this outburst, the court terminated his pro. per. status and appointed counsel for him. In response, Crump refused to attend most of the trial.

---

[3] The prior convictions for criminal threats were both under section 422.

The jury found Crump guilty of criminal threats and identity theft. Trial on the prior convictions was bifurcated, and after the trial court found that Crump was the person who had suffered the two prior convictions and that they constituted serious felonies and strikes, the jury found the convictions true. Crump then moved to strike the prior convictions on the ground that the mandatory statutory sentence that would result if they were not stricken would constitute cruel and unusual punishment under the federal and state Constitutions.

Before Crump could be sentenced, his trial counsel declared a doubt about his competency, and the trial court suspended the proceedings. After considering reports from three additional mental health experts, the court found Crump to be mentally incompetent. He was admitted to Atascadero State Hospital.

In November 2013, well over a year after the trial, the trial court found that Crump's competency was restored. A sentencing hearing ensued, and at it the court denied Crump's motion to strike his prior convictions on constitutional grounds. In addition, although Crump had not sought relief under section 1385, the court specifically declined to strike either conviction under that provision. The court sentenced him to a total term of 30 years to life in prison, comprised of a term of 25 years to life for criminal threats as a third strike, a concurrent term of 25 years to life for identity theft, and a term of five years for having previously been convicted of a serious felony.[4]

II.

DISCUSSION

A.      *The Trial Court Was Not Required to Hold a New Competency Hearing After It Appointed Counsel for Crump.*

Crump claims that his federal due process rights were violated when the trial court declined to hold a new competency hearing after it appointed counsel for him and terminated his pro. per. status in January 2012. We are not persuaded.

---

[4] The 25-years-to-life terms were imposed under sections 667, subdivision (e)(2)(A)(ii) and 1170.12, subdivision (c)(2)(A)(ii), and the five-year enhancement was imposed under section 667, subdivision (a).

1.    Additional facts.

At a pretrial conference on September 29, 2011, the trial court declared a "substantial doubt" about Crump's mental competence based on his conduct in court earlier that day.  The court summarized that conduct as follows:

> During the course of this morning, as we tried to go through the . . . conference, the defendant repeatedly was loud, talked over the court[,] and was obstreperous.  At that point[,] the court continued moving along.  However, when it came to the court talking about [whether he would wear] restraints [during trial], the defendant seemed to be getting more and more and more agitated.

> Finally, by the end of the morning the defendant . . . jumped up . . . and said, I am getting out of here.  Both sheriffs then walked to the defendant.  They are very close to him[,] it's not far, a couple of feet, and the deputy simply put his hand on [the defendant's] shoulder, at which time the defendant began screaming at the top of his lungs [that] . . . he is being abused.

> . . . [T]he sheriff was in no way engaging in any conduct that the defendant was screaming and yelling about.

> The defendant continued to scream.  He continued to yell.  He continued to have tirades about the fact that he was being abused.  Now, we are approximately three hours [after] that episode, and, again, he is screaming and yelling in the well.

> Now, the court had already formed a reasonable doubt [about] this defendant's competency based upon everything that I observed this morning.

> Prior to the screaming episode this morning with the sheriff, the defendant simply bowed his head, closed his eyes, and looked down.  The head would be in a praying position.  The defendant simply was nonresponsive.  Very catatonic, said nothing at all to be immediately followed by the tirade that he engaged in in the court's immediate view and direct presence.

The next day, following the procedure set forth in section 1368, the trial court appointed counsel for Crump on the competency issue.  Crump objected, stating that he did not want an attorney and would not attend trial if he had one.  Despite the court's

4

reassurance that counsel would be representing him for the competency determination only and that he would otherwise be retaining his pro. per. status, Crump repeatedly interrupted the court to reassert that he was pro. per., would not talk to counsel, and did not want to be present at trial if an attorney was representing him. He eventually had to be removed from the courtroom while "yelling very loudly."

The appointed attorney, who had represented Crump in a previous case, attempted to speak to him to assess his competence, but "Crump was adamant that he did not want to speak to [him]." Counsel reviewed transcripts of the previous proceedings and spoke to some sheriff's deputies and a court reporter who had also observed Crump. Counsel opined that Crump "understands the nature and purpose of these proceedings, and . . . grasps his own role in that" but expressed "a doubt as to [Crump's] capacity rationally to conduct his own defense" based on his "refusal on two occasions to speak to someone about a subject in a rational way that's independent of his right to represent himself, at least listen to somebody on two occasions." When counsel raised the possibility that Crump might be unwilling to talk with him because of his earlier representation, Crump stated repeatedly that he did not want to talk to any attorney or have any attorney represent him.

The trial court found "substantial evidence" that Crump was mentally incompetent, suspended the proceedings, ordered a competency hearing, and appointed a psychiatrist and a psychologist to evaluate him and to prepare reports. The court directed that the reports address, in addition to the general question of "whether [Crump] is or is not mentally incompetent," the questions whether he "[i]s . . . presently able to cooperate in a rational manner in presenting a defense" and whether he "[i]s . . . presently able to competently represent himself at trial, i.e., act as his own attorney." After complaining that he did not have a "mental disorder" and was "not talking to no psychologist," Crump began screaming that the sheriff's deputies were hurting him and had to be removed from the courtroom.

In November 2011, the appointed psychiatrist, Jennifer Chaffin, M.D., and a new appointed psychologist, Charles Meyers, Ph.D., both submitted reports concluding that

5

Crump was competent. Crump refused to meet with either doctor, and both reports were based on a review of information from previous cases and documents and hearing transcripts from this case. In addition, Dr. Chaffin spoke to a sheriff's deputy where Crump was jailed, and Dr. Meyers spoke to the attorney appointed to represent Crump for the competency issue.

Dr. Chaffin opined that Crump had a mental disorder, "Personality Disorder Not Otherwise Specified with paranoid, antisocial[,] and borderline traits." She concluded, however, that he was able both to understand the proceedings and to conduct his own defense. Despite the trial court's direction to determine whether Crump could "cooperate in a rational manner in presenting a defense," Dr. Chaffin's report did not address that issue and simply stated that Crump's "ability to rationally assist counsel [was] not in question" because he was pro. per.

Dr. Meyers determined that Crump "may very well and probably does have a personality disorder that includes paranoid features[] but [any] such . . . disorder in itself cannot be the basis for a finding of incompetence to stand trial." As did Dr. Chaffin, Dr. Meyers concluded that Crump both understood the proceedings and was able to conduct his own defense. But unlike Dr. Chaffin, Dr. Meyers also addressed whether Crump could cooperate with counsel in presenting a defense:

> [O]ne can safely characterize [Crump's] stance as habitually suspicious, self-righteous[,] and hostile to the point of seeming out of touch with reality and therefore irrational. But in the context of deciding whether or not [he] is competent to stand trial, that irrationality must be a product of a severe mental disorder to be relevantly "irrational." [He] does not suffer from a severe mental disorder. He is an extreme character who chooses with whom to cooperate and against whom to fight. He chooses not to cooperate with any attorneys, all of whom, prosecution and defense, as well as those attorneys who have been appointed to serve as judges, are corrupt. . . . Accordingly, [he] has struck out on his own, exercising his right to represent himself.

At a hearing in early December 2011, the parties stipulated that the trial court could determine Crump's competency based on the written reports. The court then determined that Crump was competent and reinstated the proceedings. The attorney

6

appointed to represent him for the competency issue withdrew, and the court informed Crump he could continue to represent himself.

On January 4, 2012, the day trial was to begin, the trial court "indicated that [it] was attempting to appoint stand-by counsel." As described by the court, "[A]s soon as [Crump] heard that—he hadn't even walked into the courtroom—that the Court was going to appoint stand-by counsel, he began screaming. He said, 'If you are going to appoint stand-by counsel, you will do this trial without me.' [¶] His quote was, 'Give a reason to find me guilty, [b]itch.' And the other quote was, 'Go ahead and find me guilty now.' " He also said " '[f]uck you' " to the court. The court then indicated that "to the extent that [Crump] is again as disruptive as he was this morning prior to proceeding, the stand-by counsel will be appointed to go forward and [Crump's] right to self-representation will, in fact, be terminated." The next day, Crump refused to enter the courtroom, and the court terminated his self-representation based on his prior conduct and appointed counsel to represent him.

### 2. Crump's reaction to the January 2012 appointment of counsel did not require a new competency hearing.

A defendant who, "as a result of mental disorder or developmental disability, . . . is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner" is not competent to stand trial. (§ 1367, subd. (a); *People v. Ramos* (2004) 34 Cal.4th 494, 507 (*Ramos*).) The key issue is whether the defendant has " ' " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and 'a rational as well as factual understanding of the proceedings against him.' " ' " (*Ramos*, at p. 507.) If "a doubt arises in the mind of the judge as to the mental competence of the defendant" at any time before judgment, further inquiry into the defendant's sanity is required. (§ 1368, subd. (a); *Ramos*, at p. 507.)

"Both federal due process and state law require a trial [court] to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable . . . doubt

7

concerning the defendant's competence to stand trial." (*People v. Rogers* (2006) 39 Cal.4th 826, 847.) Our state Supreme Court "ha[s] said that this standard is satisfied if at least one expert who is competent to render such an opinion, and who has had a sufficient opportunity to conduct an examination, testifies under oath with particularity that, because of mental illness, the accused is incapable of understanding the proceedings or assisting in his defense." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1047.) On the other hand, "a defendant must exhibit more than bizarre, paranoid behavior, strange words, or a preexisting psychiatric condition that has little bearing on . . . whether the defendant can assist his defense counsel." (*Ramos*, *supra*, 34 Cal.4th at p. 508.)

Where, as here, a competency hearing is held and the defendant is found competent to stand trial, "a second competency hearing is required only if the evidence discloses a substantial change of circumstances or new evidence is presented casting serious doubt on the validity of the prior finding of the defendant's competence." (*People v. Medina* (1995) 11 Cal.4th 694, 734.) Again, the trial court must determine whether there is "substantial evidence [of] competency." (*People v. Kaplan* (2007) 149 Cal.App.4th 372, 384-385.) Being mindful that " ' "[a]n appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper" ' " (*People v. Marshall* (1997) 15 Cal.4th 1, 33), we review the court's decision not to hold a competency hearing for an abuse of discretion. (*Ramos*, *supra*, 34 Cal.4th at p. 507.)

Crump claims that the January 2012 appointment of stand-by counsel and subsequent termination of his pro. per. status was the requisite "substantial change in . . . circumstances" after he was originally found competent the previous month. According to him, Dr. Chaffin's and Dr. Meyers's reports "did not adequately address the critical question whether [he] could rationally cooperate with appointed counsel" because he was representing himself at that time. He argues that "once counsel was appointed[,] . . . [h]e withdrew from the proceedings, refused to speak with his appointed attorney, refused to attend trial, repeatedly harangued the [trial] court with a delusional belief that he was the

8

object of a conspiracy to persecute him, and otherwise acted in such bizarre ways that a reasonable judge would have harbored a reasonable doubt whether [he] was competent."

In considering this argument, we first take a moment to address its scope. Crump exclusively relies on his reaction to the January 2012 appointment of counsel in arguing that new evidence or a substantial change in circumstances required a new competency hearing. Although he also discusses the evidence related to the trial court's *later* determination that he was incompetent, in his opening brief he relies on that evidence mainly to argue that, should we determine an error occurred, a remand for a retrospective competency hearing is unwarranted. In his reply brief, however, he also makes the cursory argument that progress reports submitted after he was sent to Atascadero "show[] beyond any doubt that [he] was incompetent throughout the trial" and that "[t]he trial of this mentally incompetent individual violated due process under the [federal] Constitution." To the extent this language can be construed as a separate claim, we conclude it is forfeited. (See *People v. Newton* (2007) 155 Cal.App.4th 1000, 1005 [arguments first raised in reply brief need not be considered]; *People v. Felton* (2004) 122 Cal.App.4th 260, 273 [finding argument waived where defendant did not "support it with citation to authority and reasoned argument"].)

Turning to the merits of the claim Crump has properly presented, we first address the contention that Dr. Chaffin's and Dr. Meyers's reports failed to sufficiently address his ability to assist defense counsel. Crump correctly states that Dr. Chaffin's report did not evaluate whether he could rationally assist an attorney in presenting a defense. We disagree, however, that Dr. Meyers "reached an equivocal opinion" on this issue because he acknowledged Crump's irrationality but determined it was not due to a legally cognizable mental disorder. Whether Dr. Meyers was ultimately correct that the possible "personality disorder" he identified could not support a finding of incompetency, an issue Crump argues at length, Dr. Meyers specifically found that Crump "chooses with whom to cooperate and against whom to fight . . . [and] chooses not to cooperate with any attorneys." In other words, the doctor concluded that the difficulty Crump had cooperating with attorneys was volitional. Crump does not explain why this opinion was

9

insufficient to support a determination that, as of January 2012, he was able to cooperate with counsel.

We also disagree that Crump's reaction to the appointment of counsel in January 2012 constituted a substantial change in circumstances or new evidence that triggered the need for another competency hearing. Before the trial court originally found Crump competent, it appointed counsel for him on the competency issue, and he made clear his opposition to having *any* attorney represent him. Crump argues that his reaction in January 2012 was "new evidence of irrationality" because he "was unable to comprehend the role of stand-by counsel . . . [and] refused to enter[] the courtroom if the attorney was present." But the record indicates he did not understand the role of counsel appointed for the first competency hearing either, and after that appointment, he consistently stated he would not attend the trial if an attorney was representing him. Thus, his feelings about counsel were "nothing new to the court," and Dr. Meyers had already considered them in determining that Crump was capable of cooperating with counsel. (*People v. Blacksher* (2011) 52 Cal.4th 769, 851.) Nor did Crump's reaction to the later appointment of counsel, while "bizarre" and "paranoid," suggest his mental health had deteriorated in any way that impacted his ability to assist in his own defense. (*Ramos*, *supra*, 34 Cal.4th at p. 508.) In fact, that reaction was predictable given his behavior at previous hearings, and it did not "cast[] serious doubt" on the original competency determination. (*People v. Medina*, *supra*, 11 Cal.4th at p. 734.) As a result, the trial court did not abuse its discretion by not holding another competency hearing after appointing counsel.

B.      *The Trial Court Properly Declined to Strike Crump's Prior Convictions for Sentencing Purposes.*

Crump argues that the trial court abused its discretion by not striking one of his prior convictions for sentencing purposes under section 1385 and *Romero*, *supra*, 13 Cal.4th 497. We disagree.

Crump moved to strike the prior convictions on the basis that the resulting sentence would otherwise constitute cruel and unusual punishment, not under section 1385. The trial court nevertheless considered the latter issue and determined that striking

10

the convictions under section 1385 was inappropriate. It explained that when it "balance[d] the rights of this defendant [against] the interests of society, [it] conclude[d] that the furtherance of justice compels [its] not striking these prior convictions" and that Crump did not "fall outside the . . . spirit" of the Three Strikes law. The court identified the "substantial aggravating factors" that Crump had (1) previously been convicted of the same type of conduct, "criminally threatening public officials and members of the community"; (2) exhibited "a pattern of regular and/or increasingly serious criminal behavior," given the two prior convictions and "other misdemeanor convictions" within the previous six-and-a-half years; and (3) "served two prior prison terms," followed by "unsatisfactory" conduct on parole.

A trial court may, on its own motion and "in furtherance of justice," dismiss a finding that a defendant has previously been convicted of a strike. (§ 1385, subd. (a); *People v. Carmony* (2004) 33 Cal.4th 367, 373; *Romero*, *supra*, 13 Cal.4th at pp. 529-530.) "In ruling whether to [do so] . . ., or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [Three Strikes law]'s spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

We review for an abuse of discretion the determination whether to dismiss a strike under section 1385. (*People v. Carmony*, *supra*, 33 Cal.4th at p. 374.) The Three Strikes law, which is " 'intended to restrict courts' discretion in sentencing repeat offenders[,]' . . . [¶] . . . [¶] . . . creates a strong presumption that any sentence that conforms to [its] sentencing norms is both rational and proper." (*Id.* at pp. 377-378.) As a result, "a trial court will only abuse its discretion in failing to strike a prior felony conviction . . . in limited circumstances," such as where it did not realize it had discretion to do so, where it "considered impermissible factors in declining to dismiss" the conviction, or where " 'the sentencing norms [of the Three Strikes law] produce[] an

11

"arbitrary, capricious[,] or patently absurd" result' under the specific facts of a particular case." (*Id.* at p. 378.)

Crump does not claim that the trial court misunderstood the scope of its discretion or considered improper factors. Instead, he argues that he falls "outside the spirit of the Three Strikes law" for four different reasons: (1) the two prior convictions "arose out of a single act"; (2) he "is not a career criminal"; (3) he never followed through on any of his threats; and (4) his "crimes appear to be the product of mental illness." We consider each reason in turn.

Resolution of the first issue—whether the two prior convictions arose from a single act—is governed by *People v. Vargas* (2014) 59 Cal.4th 635 (*Vargas*), which was decided a few months after Crump submitted his opening brief. In *Vargas*, our state Supreme Court held that "two prior convictions arising out of a single act against a single victim can[not] constitute two strikes under the 'Three Strikes' law," requiring a trial court to dismiss one of them. (*Id.* at pp. 637, 639.) The defendant in *Vargas* had previously been convicted of robbery and carjacking, crimes that "were not only tried in the same proceeding and committed during the same course of conduct . . . [but also] based on the same act, committed at the same time, and against the same victim." (*Id.* at p. 638.) The Supreme Court concluded that treating the defendant as a "third strike offender[] was inconsistent with the intent underlying both the legislative and initiative versions of the Three Strikes law":

> The initiative version of the Three Strikes law came into being when 1994's Proposition 184 was passed by the voters. As the ballot argument in favor of that initiative explained:"Here's how it works: [¶] Strike One: One serious/violent felony serves as a first strike toward a stiffer prison term. [¶] Strike Two: second felony conviction with one prior serious/violent felony, DOUBLES the base sentence for the conviction. Any additional enhancements under existing law, including those for prior convictions, are then added. [¶] . . . [¶] Strike Three: A third felony conviction, with two serious/violent prior felonies, TRIPLES the base sentence or imposes 25 years to life, whichever is greater." [Citations.]
>
> Given this information, the voting public would reasonably have understood the "Three Strikes" baseball metaphor to mean that a person

would have three chances—three swings of the bat, if you will—before the harshest penalty could be imposed.  The public also would have understood that no one can be called for two strikes on just one swing.  Permitting the trial court below to treat defendant's 1999 robbery and carjacking convictions as separate strikes—despite the fact they were based on a single criminal act—would do just that, and thus contravene the voter's clear understanding of how the Three Strikes law was intended to work.  Given the obvious twinning of the language used in the legislative version of the Three Strikes law, we discern no different intent with that version of the law.

(*Vargas,* at pp. 645-646.)

In reaching its conclusion, the Court emphasized it was addressing a single criminal act, not "multiple criminal acts . . . committed in a single course of conduct." (*Vargas*, *supra*, 59 Cal.4th at p. 648, italics omitted.)  It disagreed with the Attorney General's contention that a defendant "poses a greater risk to society merely because the Legislature has chosen to criminalize the act in different ways," because "that it has done so does not of itself make an offender more blameworthy, or more dangerous, within the meaning of the Three Strikes law."  (*Id.* at pp. 646-647.)  Where, in contrast, a defendant commits multiple criminal acts, even if on the same occasion, the court agreed there was a " 'qualitatively higher risk to public safety' " (*id.* at p. 646), consistent with its earlier holding in *People v. Benson* (1998) 18 Cal.4th 24 that two convictions could both be treated as strikes even though the "crimes could not be separately punished at the time they were adjudicated because they were committed during the same course of conduct (§ 654)."  (*Vargas*, at p. 638.)

Crump argues that his prior convictions "arose out of a single act" because they "arose out of a single e-mail that he sent to a single person."  We disagree.  A conviction of criminal threats requires proof " '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat . . . was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person

13

threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.' " (*In re George T.* (2004) 33 Cal.4th 620, 630.) Here, Crump's convictions were based on two separate threats to commit two separate crimes against two separate victims: one to kill the county supervisor, and one to kill the sheriff. Crump provides no authority for the proposition that multiple threats are transformed into a single act under *Vargas*, *supra*, 59 Cal.4th 635 merely because they happen to be made in the same document. The trial court was not required to strike one of the prior convictions under *Vargas* because the convictions were not based on a single act.[5]

We may more quickly dispose of Crump's remaining arguments for why his circumstances fall "outside the spirit of the Three Strikes law." We reject his second contention—that he is not a career criminal because his criminal record is not long in comparison to that of other Three Strikes offenders—because the fact that courts have properly sentenced "worse" criminals under the Three Strikes law does not permit an inference that offenders with shorter records necessarily fall outside the spirit of the law. Moreover, Crump fails to identify any cases in which defendants with records similar to his avoided being sentenced under the Three Strikes law.

His third contention—that his circumstances fall outside the spirit of the Three Strikes law because he never attempted to physically harm the targets of his threats—is similarly unavailing. Many serious crimes not involving physical violence are subject to the Three Strikes law, including criminal threats. (See generally § 1192.7, subd. (c)(1) [listing categories of serious felonies].) Moreover, while a conviction of criminal threats

---

[5] *People v. Rusconi* (2015) 236 Cal.App.4th 273 held that *Vargas*, *supra*, 59 Cal.4th 635 is inapplicable when two prior convictions involve a single act but "multiple victims of violence." (*Rusconi*, at pp. 279-281.) Because we base our holding on the fact that Crump's prior convictions involved multiple acts, not merely multiple victims, we need not and do not decide whether *Rusconi*'s holding is consistent with *Vargas*'s statement that "no one can be called for two strikes on just one swing." (*Vargas*, at p. 646.)

14

" 'does not require that the violator intend to cause death or serious bodily injury to the victim, not all serious injuries are suffered to the body. The knowing infliction of mental terror is equally deserving of moral condemnation.' " (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1024, italics omitted [holding that violation of section 422 is "act of violence" for purposes of "multiple-victim exception to section 654"].) Crump is not entitled to relief merely because crimes more egregious than the ones he committed are also subject to the Three Strikes law.

Lastly, we reject Crump's fourth argument that his circumstances fall outside the spirit of the Three Strikes law because his "crimes appear to be the product of mental illness." Crump does not argue that the trial court failed to take his mental condition into account, and the court specifically stated it had considered "the particulars of [Crump's] background, character[,] and prospects" in reaching its ruling. Nor does he offer any authority for the proposition that the spirit of the Three Strikes law is violated by sentencing mentally disordered but competent defendants under it. We are not in a position to second-guess the Legislature's policy decision to impose long sentences on such defendants who have repeatedly engaged in serious criminal behavior. We conclude that the court properly exercised its discretion in refusing to strike either prior conviction.

### C. *Crump's Sentence Does Not Constitute Cruel and Unusual Punishment.*

Finally, Crump claims that his sentence violates the prohibition against cruel and unusual punishment under state and federal law. While we recognize that his sentence is lengthy, we cannot agree with him that it is unconstitutional.

When faced with a claim of cruel and unusual punishment under either the federal or state Constitution, "[a] reviewing court determines whether a particular penalty given ' "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1235.) "We . . . use a three-pronged approach to determine whether a particular sentence is grossly disproportionate." (*People v. Johnson* (2010) 183 Cal.App.4th 253, 296.) "First, we review 'the nature of the offense and/or the

15

offender, with particular regard to the degree of danger both present to society.' " (*Ibid.*) This analysis requires consideration of " 'the circumstances of the offense, including the defendant's motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts,' " as well as " 'the defendant's age, prior criminality[,] and mental capabilities.' " (*Cole*, at p. 1235.) "Second, we compare the challenged punishment with punishments prescribed for more serious crimes in our jurisdiction. [Citation.] Third, and finally, we compare the challenged punishment to the punishments for the same offense in other jurisdictions. [Citation.] The importance of each of these prongs depends upon the facts of each specific case[, and] . . . we may base our decision on the first prong alone." (*Johnson*, at pp. 296-297.) " 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' " (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358.)

Here, Crump addresses only the first prong, arguing that his sentence is "grossly disproportionate to [his] culpability" for the same reasons he identified in his previous claim involving section 1385. He contends that he "committed two acts that resulted in three felonies, none of which involv[ed] physical assault or injury." But the fact is he directly threatened three different individuals and some of their associates and family members. As discussed above, the crime of criminal threats is a serious felony that involves the intentional infliction of mental suffering on others. While it does not require the infliction of physical violence, it is far from victimless, and we cannot discount its seriousness.

Crump also argues that he "has a history of mental illness and persecutory delusions that may well have caused him to write the threatening messages[] and . . . lessens his culpability." We acknowledge that a sentence of 30 years to life seems harsh for someone with his characteristics. But "whenever a putatively disproportionately harsh sentence is specified under the Three Strikes law, it is subject to judicial modification at sentencing [under section 1385] if the sentencing court deems it appropriate. [Citation.] This safety valve suffices for constitutional purposes; no greater

16

and more informed wisdom concerning an offender's culpability is, as a matter of course, available to a reviewing court." (*People v. Mantanez*, *supra*, 98 Cal.App.4th at pp. 366-367.) And here, the role Crump's mental issues may have played in his crimes is speculative, as his phrase "may well have" recognizes. Even if we assume that he had a mental disorder when he committed the offenses, there has been no showing that such a disorder prevented him from controlling his actions, prevented him from understanding what he was doing, or otherwise "diminish[ed his] personal culpability." (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1344-1345 [holding death penalty not cruel and unusual punishment for defendant with antisocial personality disorder].) We cannot conclude on this record that his sentence constitutes cruel and unusual punishment.

III.
DISPOSITION

The judgment is affirmed.


_____
Humes, P.J.


We concur:


_____
Dondero, J.


_____
Banke, J.

17