Filed 12/3/15  P. v. Helton CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C074393 |
| Plaintiff and Respondent, | (Super. Ct. No. 04F11425) |
| v. | |
| RICHARD HELTON, | |
| Defendant and Appellant. | |

In 2004, defendant Richard Helton, who had been drinking, assaulted his live-in girlfriend Karen Demetrio, threatened to kill her, and strangled her until she passed out. Both defendant and Demetrio have histories of serious mental illness.  In the more than eight years of litigation prior to his conviction by jury, defendant at times represented himself and at times was represented by various counsel, both appointed and retained. His first trial, in 2005, ended prematurely in a mistrial due to his own misbehavior.

The trial court twice found defendant incompetent to stand trial and committed him to Napa State Hospital (NSH).  Eventually, despite multiple doctors opining that he

1

was unlikely to regain competency to stand trial in the foreseeable future, a jury found him competent based on his recorded telephone conversations regarding trial strategy.

In 2013, a jury found defendant guilty of attempted murder (Pen. Code, §§ 664/187, subd. (a))[1] with a great bodily injury enhancement (§ 12022.7, subd. (e)), related assaultive crimes, and criminal threats (§ 422). Defendant admitted four prior convictions; three were serious felonies, brought and tried together, that qualified as one 5-year prior (§ 667, subd. (a)) and three strikes (§§ 667, subds. (b)-(i), 1170.12), and the fourth as a one-year prior (§ 667.5, subd. (b)). The trial court sentenced defendant to the upper term on the attempted murder conviction for an aggregate unstayed sentence of 27 years to life plus 11 years.

On appeal, defendant challenges aspects of three different phases of the proceedings. As to the trial on guilt, he contends there was instructional error as no evidence supported the instruction on mutual combat (CALCRIM No. 3471). We agree that there was error, but find it harmless for reasons we explain. Next, defendant argues the trial court abused in its discretion (during pre-trial proceedings) in failing to hold a (third) competency proceeding when his new counsel declared a doubt. Finally, he contends he received ineffective assistance of counsel at the competency jury trial. We find no merit in these contentions and shall affirm the judgment.

## FACTS

*The Crimes*

Defendant met Karen Demetrio at a group therapy session for alcoholics at the Veterans Administration (VA). They first were roommates and then became physically involved. Although defendant was on parole with a condition that he not drink alcohol, he still drank it. When defendant drank a lot of alcohol, he became verbally abusive and

---

[1] Further undesignated statutory references are to the Penal Code.

threatened to kill Demetrio. After one such incident in July 2004, she called the police and defendant was sent to prison for five months on a parole violation.

On December 28, 2004, defendant was drinking heavily. He was very angry and accused Demetrio of sleeping with someone else and threatened to kill her. He grabbed her hair and started to strangle her. She bit his finger and grabbed a glass ashtray which she used to hit him on the head twice. She tried to use a phone but he pushed it out of her hand. In the struggle, she pushed back on the chair she was in and it tipped over. She crawled to get the ashtray again. Defendant grabbed the ashtray and hit her in the head very hard. He pulled her towards him by her legs, then grabbed her by the neck and strangled her until she passed out.

When she woke up, defendant was sitting on the floor looking at her. He told her to clean up the blood. She tried to but she was very weak. She asked defendant for permission to lie down and soon fell asleep. When she awoke the next morning, defendant was asleep in the bed. Both were bleeding from their heads.

Demetrio called a friend and left, first going to the emergency room at the VA hospital. As she waited for the doctor, she heard a "code blue" on the intercom and left, concerned defendant would get away during the wait. She went to her friend's, where she called defendant's parole officer, who told her to call the police. After calling the police, Demetrio took a shower and lay down. When the police officer arrived, Demetrio appeared nervous and shaken. The whites of her eyes were red. She had bruising around her eyes, her neck was swollen and bruised, and she had a laceration on the top of her head. An officer took photographs of her injuries.

Demetrio gave the officer the keys to the apartment. The officer went to the apartment and knocked twice with no answer. He entered and saw defendant on the couch, smelling of alcohol and with glassy eyes. Defendant had a laceration on his head and a scratch or cut on his finger. There was blood on his sweatpants and on a pair of jeans in the bedroom. There was blood on a glass ashtray.

3

Demetrio returned to the emergency room. She reported pain in her neck. Blood vessels in the sclera (whites) of her eyes had broken. She was bruised and had a laceration on the back of her head. The People called an expert in strangulation who defined strangulation as external compression of the neck until consciousness is altered. Based on his review of Demetrio's medical records, he found evidence of strangulation. He testified it would be "exceedingly difficult" to self-inflict the injuries reflected by the medical records.

*Defendant's Other Crimes*

The parties stipulated that defendant had been convicted in 1978 of burglary, sodomy, and rape while armed with a weapon. He served his entire sentence and was released in 1993.

In 2000, defendant was staying in a trailer on the property of Beth Finder.[2] In August, she called the police, reporting threats by defendant. Officers arrived, found a rifle in defendant's trailer and arrested him for being a felon in possession of a firearm. In a signed statement introduced at trial, Beth declared that defendant had been explosive for a week and his anger was escalating. He was out of control and she was fearful, especially since he had a gun. She believed defendant needed "mental help desperately." On the stand, Beth denied the incident and claimed she was told what to write in the statement; it was "dictated" to her. She asserted she had called the police only to turn in some "decrepit" guns. Medical records showed that in May 2000, Beth had sought medical treatment for pain, claiming she was hurt in an altercation with a roommate. At trial, when confronted with these records, she stated, "That's not possible."

---

[2] The witness stated her name as Beth Finder Manning, but the court and parties referred to her as Miss Finder. Previous defense counsel, who was the witness's counsel, referred to her as Ms. Harris. For purposes of clarity and convenience, we adopt the parties' practice and refer to this person as Beth.

On July 3, 2004, police responded to a domestic violence call at defendant and Demetrio's apartment. Defendant had been on a three-day alcohol binge. He smelled of alcohol and had an unsteady gait and glassy, bloodshot eyes. He alternated between being very polite to verbally abusive and hostile. He was arrested for violating his parole by drinking alcohol.

*The Defense*

Defendant claimed self-defense. He contended that Demetrio--who had a history of violence and dishonesty and 20 years of psychiatric issues--had attacked defendant with the ashtray and he had responded with a "control hold" to immobilize her. When he let go, she hit him in the back of the head with the ashtray.

In statements to the court during his 2005 trial (while representing himself), defendant admitted he "put [his] hands around [Demetrio's] neck to cutoff (*sic*) her oxygen to stop her from hitting [him] with that glass ashtray." He asserted it was self-defense and Demetrio was the initiator. He claimed that only Demetrio touched the ashtray. Her wounds were self-inflicted and she washed the ashtray. He never hit her. He claimed Demetrio had brought in a replacement ashtray.

In the 2013 trial, the defense strategy was to discredit Demetrio and attack her credibility in large part due to her mental health issues. She had been raped while in the Air Force and suffered from posttraumatic stress disorder. She had also been diagnosed with bipolar II disorder, alcohol dependency, marijuana dependency, and borderline personality disorder. She did not always take her medication, missed appointments, and had a history of harming herself. She had reported hearing voices. In February 2004, she was suicidal, scared, and paranoid. She had delusional thoughts, grandiosity, and extremely negative thinking. According to her treating psychiatrist, Demetrio sought help and was working hard to correct her problems and become healthy. By the time of the 2013 trial, she had been employed by the state for eight years. The defense presented

5

several witnesses, including Demetrio's ex-husband, who testified about her previous acts of violence and her dishonesty. Defendant did not testify.

**DISCUSSION**

I

*Instructional Error: CALCRIM No. 3471*

Defendant contends the trial court prejudicially erred in instructing the jury with CALCRIM No. 3471, which described determining self-defense if defendant was the initial aggressor or there was mutual combat. He claims there was no evidence of mutual combat, as defined in *People v. Ross* (2007) 155 Cal.App.4th 1033. He argues the error was prejudicial because it allowed the jury to deny his claim of self-defense because he did not stop fighting and communicate his intent to do so to Demetrio, as required by the mutual combat portion of the instruction.

A. *The Instruction and the Definition of "Mutual Combat"*

Without objection from either party, the trial court (Goodman, J.) instructed the jury with the full language of the 2013 version of CALCRIM No. 3471 as follows: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; [¶] 2. He indicated, by word or by conduct, to his opponent in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; [¶] AND [¶] 3. He gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, communicate the desire to stop the opponent, or give the opponent a chance to stop fighting. [¶] A fight is *mutual combat* when it began or continued by

6

mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."[3]

In *Ross,* the trial court gave an earlier version of this instruction that did not define "mutual combat." (*People v. Ross, supra*, 155 Cal.App.4th at p. 1042 & fn. 9.) When the jury asked for clarification and the legal meaning of "mutual combat," the trial court responded there was no legal definition and to use the common, everyday meaning of those words. (*Id*. at pp. 1042-1043.) The appellate court found this response was error. (*Id*. at p. 1047.) In the context of self-defense, " 'mutual combat' means not merely a reciprocal exchange of blows but one *pursuant to mutual intention, consent, or agreement preceding the initiation of hostilities*." (*Id*. at p. 1045, original italics.) To give an instruction on mutual combat, "there must be evidence from which the jury could reasonably find that *both combatants actually consented or intended to fight before the claimed occasion for self-defense arose*." (*Id*. at p. 1047, original italics.)

Unlike the instruction given in *Ross*, the 2013 version of CALCRIM No. 3471 includes this definition of mutual combat. "A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose."

B. *Analysis*

We agree with defendant that here there was no evidence of a mutual consent or intent to fight between defendant and Demetrio. Thus there was no evidence of mutual combat. The People assume the same for purposes of argument. From this evidence,

---

[3] Initially, we note that that CALCRIM No. 3471 is not intended to be given in full. Rather, the pattern instruction contains alternative language and bracketed portions. Just as the instructing court selects the proper pronoun based on defendant's gender, the court should select only those portions of the pattern instruction--relating to one who starts the fight, mutual combat, or the initial use of non-deadly force--that apply to the case and are supported by the evidence.

either defendant or Demetrio started the fight and the other responded in self-defense. The trial court should not have instructed the jury on mutual combat.

"It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case. [Citation.]" (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) Such error is not of federal constitutional dimension, but an error of state law subject to the traditional test of *People v. Watson* (1956) 46 Cal.2d 818, at page 836. (*Guiton,* at p. 1129.) In determining whether the error was prejudicial, we examine the entire record, "including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict. [Citation.] Furthermore, instruction on an unsupported theory is prejudicial only if that theory became the sole basis of the verdict of guilt; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict. . . . The appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Id.* at p. 1130.)

Here there is no reasonable probability that the jury based its verdict on mutual combat precluding self-defense; accordingly, the error was harmless.

Other than the instruction, there was no mention of mutual combat at trial. Unlike in *Ross*, the jury did not ask any question about mutual combat and the instruction provided the legal definition. The jury was presented with two starkly different views of the evidence and was asked to decide who started the fight. The People's argument was that self defense was not available to defendant because *he* started the fight: "A person doesn't have the right to self-defense when you provoke the fight. [¶] That's what he did in this case. He was the provoker. He was the one who started this. He disabled the phone. He came at her." Jurors are well-equipped to analyze evidence and reach a

rational conclusion. Their own intelligence and experience prevents them from relying on a factually inadequate theory. (*People v. Guiton, supra*, 4 Cal.4th at p. 1131.)

Defendant argues *Guiton* does not apply because this is not a case of a factually inadequate theory being presented to the jury, but rather foreclosure of defendant's only defense--self-defense. We disagree. The court instructed on defendant's right to defend himself (CALCRIM No. 3470); specifically, the court instructed the jury that defendant would act in lawful self-defense if he "reasonably believed that he was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully"; he "reasonably believed that the immediate use of force was necessary to defend against that danger"; and he "used no more force than was reasonably necessary to defend against that danger." The court also instructed the jury, "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." (CALCRIM No. 200.)

We presume the jury was able to understand and correlate all of the court's instructions and follow them. (*People v. Scott* (1988) 200 Cal.App.3d 1090, 1095.) Since there was no evidence of mutual combat, we presume the jury followed the instruction to disregard that portion of the instruction. Nothing in the instructions, however, prevented the jury from considering evidence of self-defense, on which the court also instructed. The instructions given did not eliminate defendant's claim of self-defense. Rather, the jury rejected the defense based on the evidence.

## II

### *Denial of Competency Hearing*

Defendant contends the trial court abused its discretion in denying him yet another competency hearing in March 2013 (before trial). Defendant contends the trial court erred by conjoining the disjunctive standard for such a hearing and requiring that there be

9

*both* a substantial change in circumstances and a serious doubt as to the previous finding of competence, when only one is required. Defendant emphasizes his long-standing mental health issues and the previous findings that he was incompetent to stand trial.

A. *Background*

### 1. **Defendant's First (2005) Criminal Trial**

After the preliminary hearing, the trial court relieved defendant's retained attorney and granted defendant pro per status. During the extensive in limine motions and Evidence Code section 402 hearings, defendant was often disruptive. During jury selection, defendant disclosed personal information about a juror in violation of a court order. The trial court eventually found defendant "out of control" for shouting and making disparaging comments. Defendant declared a "state of war" against the trial court and refused to recognize the court's authority. The court revoked defendant's pro per status and declared a mistrial.

### 2. **Competency Proceedings**

In January 2007, defendant's counsel declared a doubt as to defendant's competence to stand trial based on his inability to cooperate with counsel. (§ 1368.) The People claimed that defendant was only *unwilling* to cooperate, not unable. Defendant was evaluated by a psychiatrist and three psychologists. The psychiatrist and two psychologists found defendant was able to understand the proceedings but unable to rationally assist counsel due to his mental illness, specifically his delusions. The third psychologist found defendant's "difficulty or refusal to work with his attorney is more a matter of manipulation oppositional traits, as opposed to emotional interference or cognitive limitations."

The trial court (Smith, J.) found defendant incompetent to stand trial and committed him to NSH.

In September 2008, NSH certified that defendant was restored to mental competency.

10

Two years later, in 2010, defendant's appointed attorney (Kenneth Rosenfeld) declared a doubt as to defendant's competence following defendant's unsuccessful *Marsden* motion.[4] The People took the position that defendant was malingering. The trial court (Winn, J.) had observed a change in defendant and questioned his ability to work with his attorney. The court appointed two experts to evaluate defendant. Both the psychiatrist and the psychologist found defendant incompetent to stand trial. Defendant was able to understand the criminal proceedings but unable to assist his attorney in a rational manner. Defendant had a delusional belief that the defense attorney and the district attorney were in collusion against him.

The parties submitted the matter on the doctors' reports. The court found defendant incompetent to stand trial and committed him to NSH. In January 2012, NSH reported to the court that defendant was unlikely to regain trial competence in the foreseeable future. His diagnoses included a delusional disorder. The treatment team recommended initiation of conservatorship proceedings.

### 3. **Defendant's Competency Trial**

The People requested a competency trial. Defendant, now represented by retained counsel Ellen Dove, requested a jury trial.

The defense called four expert witnesses: a psychiatrist who had previously evaluated defendant, a staff psychiatrist and a staff psychologist from NSH, and a psychiatrist who had been recently retained to evaluate defendant. They all opined that defendant was incompetent to stand trial due to his delusional disorder. Defendant believed all departments of the legal system were in collusion against him and he refused to work with an attorney who was not willing to accept his version of events. This response was not voluntary.

---

[4] *People v. Marsden* (1970) 2 Cal.3d 118.

11

The defense also called Robert Cassinelli. Cassinelli is a lecturer in humanities at California State University Sacramento. He spent 20 years in the Air Force, much of it in intelligence. He works as a trial consultant and Dove had previously hired him as a "human lie detector." Cassinelli worked for defendant and held a durable power of attorney for him; Cassinelli testified that defendant was his client, not his friend. On occasion, Cassinelli transmitted information from Dove to defendant. The People successfully objected to Cassinelli's opinions about defendant's trial competency. The People questioned Cassinelli about telephone calls with defendant in which defendant discussed the competency trial. The announcement that preceded acceptance of these calls said: "These conversations will be recorded and monitored."

The People's case for defendant's trial competency was based on excerpts of recorded telephone calls defendant made while in jail before the competency trial. In the calls, defendant discusses trial strategy with both Cassinelli and defendant's girlfriend Beth.

There are excerpts of two calls between defendant and Cassinelli. In the first, Cassinelli tells defendant that Dove was "spot on" in her recommendations about defendant's demeanor during trial. He told defendant "we're going to win this thing my friend" and "we're going to get you out." They discussed the prosecutor and defendant did not understand why he did not "just let me go out the back door nice and private like." Cassinelli said the prosecutor was a "jerk." Defendant just wanted to go home and questioned how committed his attorneys were. Cassinelli assured defendant they were committed. In the second call defendant indicated that if he was found competent, he hoped "the team" would be "resilient." He indicated he was making notes, drawing diagrams, and making lists of witnesses.

There are excerpts of three calls to Beth. In the first, defendant does almost all the talking. He tells Beth the district attorney is challenging NSH's findings on competence and the matter is set for trial, and that Judge Winn did not recuse himself and that issue is

being preserved for appeal.[5]  He explains a finding of competence puts them back to "square one" and the delay will cause problems with witnesses.  Defendant discusses Demetrio and her testimony and how he thought the district attorney would not challenge the finding of his continued incompetency, but would "bow out gracefully and just accept [NHS's] finding and I go on conservatorship."  He discusses the hiring and payment of the psychiatrist to evaluate him.  In both the second and third calls defendant explains to Beth the process for conservatorship and why it is better to have Cassinelli, who has the power of attorney, as his conservator rather than her.  Defendant also discusses the possibility of a plea deal.

The jury found defendant competent to stand trial.  The court (White, J.) indicated it was impressed with defendant's level of competency and denied defendant's motion for a judgment notwithstanding the verdict, stating:  "I think the jury got it right."

### 4.  **Subsequent Request for Competency Hearing**

About a year later in March 2013, defendant's public defender requested an in camera hearing on defendant's competency.  Counsel stated defendant was incompetent to stand trial as he was unable to assist counsel rationally and asked the court to appoint a psychiatrist to evaluate defendant.  Counsel claimed there was a substantial change in circumstances; over the past six months defendant had become increasingly irrational, delusional, and paranoid.  Counsel's supervisor concurred that defendant's mental state appeared to be decompensating and deteriorating.  Dove, who was now representing defendant on civil matters, voiced similar concerns.

Counsel stated that defendant had a delusion of persecution; defendant believed everyone was working with the district attorney to secure his conviction and withhold exculpatory evidence.  Defendant believed the entire system was corrupt and everyone

---

[5]  Judge Winn denied a defense motion to disqualify him pursuant to Code of Civil Procedure section 170.4, subdivision (b) as untimely and without legal basis.

13

was conspiring against him. He was fixated on the prosecutorial misconduct conspiracy and could not stay focused. Counsel reported that defendant was becoming uncontrollably angry.

The People, not present at the in camera hearing, told the court they were unaware of any substantial change in circumstances or new evidence. The trial date had been set and it was the People's position that this was defendant's "last ditch effort" to avoid trial.

The trial court (Winn, J.) indicated that after a defendant had been found incompetent and then restored to competency, the standard to suspend criminal proceedings was "a substantial change in circumstances casting serious doubt on the previous finding that defendant was competent. I'm not there yet." The court recalled its previous concerns about defendant's competency, but noted it had not observed anything this time that raised serious questions about defendant's ability to cooperate with counsel. It denied the request to suspend proceedings.

B. *The Law*

A defendant who, as a result of mental disorder or developmental disability, is "unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner," is incompetent to stand trial. (§ 1367.) "To be competent to stand trial, defendant must have ' " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and 'a rational as well as factual understanding of the proceedings against him.' " ' [Citation.]" (*People v. Ramos* (2004) 34 Cal.4th 494, 507 (*Ramos*).) When a defendant presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. (*People v. Stankewitz* (1982) 32 Cal.3d 80, 92.)

"When a competency hearing has already been held and the defendant has been found competent to stand trial, however, a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances *or* with new evidence' casting a serious doubt on the validity of that

14

finding. [Citations.]" (*People v. Jones* (1991) 53 Cal.3d 1115, 1153, italics added.) In such circumstance, "the trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state." (*Ibid.*)

"The court's decision whether to grant a competency hearing is reviewed under an abuse of discretion standard." (*People v. Ramos, supra,* 34 Cal.4th at p. 507.) " ' "An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper." ' [Citation.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 33.)

C. *Analysis*

Defendant contends the trial court abused its discretion because it misstated the applicable standard for holding a subsequent competency hearing, requiring defendant to satisfy both prongs of the disjunctive test. "Generally, the reason a trial court gives for its ruling is irrelevant on appeal because 'we review the trial court's actual ruling, not its reasons,' and '[a] judgment or order correct in theory will be affirmed, even where the trial court's given reasoning is erroneous.' [Citation.]" (*Kennedy v. Superior Court* (2006) 145 Cal.App.4th 359, 368.) Thus, we consider whether defendant presented evidence of either substantial changed circumstances or new evidence that cast a serious doubt on the validity of the previous finding of competence.

As set forth *ante*, this defendant had a considerable history of competency issues. Most relevant here, the court that heard the 2013 request for competency hearing had previously (2010) observed a change in defendant and questioned his ability to work with his attorney. Following evaluations by two appointed doctors, the court found defendant incompetent to stand trial and committed him to NSH. Subsequently, a jury found defendant competent, based on his telephone conversations involving trial strategy that showed defendant both understood the proceedings and was able to assist counsel in a rational manner.

15

This time, the same court (Winn, J.) had *not* observed a change in defendant. The court's observation is an appropriate factor in determining whether there has been some significant change in the defendant's mental state. (*People v. Jones, supra,* 53 Cal.3d at p. 1153.) (New) counsel's reasons for declaring a doubt focused on defendant's delusional belief that everyone was colluding against him. At the competency jury trial, this *same* delusional belief had been offered as the basis for defendant's alleged incompetency by prior counsel. The manifestation of earlier problems, such as delusional beliefs, is not a substantial *changed* circumstance. (*People v. Dunkle* (2005) 36 Cal.4th 861, 904-905, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*); *People v. Lawley* (2002) 27 Cal.4th 102, 136-138.) Counsel claimed defendant was deteriorating and becoming more irrational, but defendant had a history of increasingly irrational and uncooperative behavior as the trial date grew closer.

Defendant claims he did not seek a finding of incompetence and wanted to proceed to trial to prove his innocence. Although defendant consistently stated this position to his attorneys and the various doctors who evaluated him, the recorded calls revealed that he sought something else entirely. In the calls, defendant made clear his wish to "go out the back door nice and private like" and get a conservatorship with Cassinelli as his conservator. He expressed his annoyance with the People's position. "[T]his is ridiculous. I mean I thought they would want to bow out gracefully and just accept [NSH's] finding and I go on conservatorship."

Defendant contends there was *new* evidence of his trial incompetence as no defense attorney had testified at the competency jury trial. Both his current public defender and his previous counsel (Dove) declared a doubt as to his competence. While defendant offered *new witnesses* on the issue of his competence, he did not indicate that such witnesses would offer *new evidence*. Rather they would discuss the same evidence of irrational delusions and uncooperative behavior that was presented at the competency jury trial and refuted by defendant's own words in recorded telephone calls.

16

The trial court did not abuse its discretion in denying another competency hearing.

III

*Ineffective Assistance of Counsel at Competency Hearing*

Defendant contends he was denied effective assistance or conflict-free assistance of counsel by Dove at the competency hearing. He points to several areas where he asserts her representation was deficient or hampered by a conflict of interest. "A defendant claiming ineffective assistance of counsel under the federal or state Constitutions must show both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome. [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 664.) As to each claim, defendant has failed to establish either deficient performance or prejudice.

A. *Background*

Dove's involvement in this case and her representation of defendant was unusual so we set it out at some length to give context to the claim of ineffective assistance of counsel.

In 2010, when defendant's appointed attorney Rosenfeld declared a doubt as to defendant's competency, attorney Dove wanted to represent defendant at the section 1368 hearing. The record is unclear as to precisely what Dove's interest in the case was at this point. She told the court she would second chair Rosenfeld, but Rosenfeld refused that arrangement: "Ms. Dove's reputation would preclude that." The People asserted that defendant should have the panel attorney (Rosenfeld) or retained counsel (Dove), but there was no middle ground. Dove represented that she was a civil law attorney and could handle the section 1368 hearing, but she was not prepared to take the entire case. The court ruled Rosenfeld should handle the matter.

Dove stated defendant could ask her to represent him and relieve his appointed counsel. Defendant said that was what he wanted to do. The People wanted a representation from Dove that she would handle the entire case with no delays. Dove

17

made that representation, but the People also wanted her to associate competent criminal law counsel as she had stated she was not competent to handle the criminal trial. The court ruled Rosenfeld would remain as sole counsel, prompting an outburst from defendant, and a motion to disqualify by Dove (see footnote 4, *ante*). As we previously detailed, the court found defendant incompetent to stand trial.

In 2012, at the time of the jury trial on competency, Rosenfeld was relieved and defendant retained Gloria Martinez-Senftner as counsel, who then associated Dove as counsel. Dove represented defendant at the competency trial. Dove told the court that even though she was retained, "I'm substantially pro bono here and I don't have a budget." She said she thought it was unfair that because defendant no longer had a panel attorney, he was now expected to pay for everything when his ability to pay had not increased. She had "no wish to subsidize the case out of my pocket." The court told her to contact the panel about funding assistance.

Before the witnesses were called, the court and the parties discussed the admission of the recorded telephone calls that defendant made from jail. Dove objected to the admission of the calls. As to those made to Beth, Dove objected because Beth was her client and she would have to cross-examine her own client. The court pointed out that Dove had listed Beth as a potential witness. Dove believed the calls were hearsay. As to the calls to Cassinelli, Dove raised the attorney-client privilege because Cassinelli conveyed messages from Dove to defendant. Dove noted that although she had been provided with the recordings the previous week, she had not been able to listen to them yet because of computer problems. She later noted that Cassinelli was unwilling to take the time to listen to the recordings.

At the beginning of Cassinelli's testimony, there was a sidebar conference. The People later put on the record that there was a waiver of any attorney-client privilege before Dove proceeded to elicit substantive testimony from Cassinelli.

18

After defendant's witnesses had testified, the issue of the recorded calls arose again. Dove represented that she had not listened to the calls as she was expecting to call Beth to explain them, and continued to object that the calls to Beth were hearsay. The court ruled defendant's calls to Beth fell under the party opponent exception to the hearsay rule and Beth's statements were offered only to provide context. Dove stated she was electing not to call Beth as a witness.

After the verdict of competency, Dove moved orally for a judgment notwithstanding the verdict. Dove complained the trial "went too quickly" and she was unable to put the recorded calls "into context." The trial court interrupted Dove's rambling and required a written motion. In the written motion, Dove explained at length her problems in dealing with defendant, arguing he was incompetent to stand trial. She explained she considered serving a subpoena on Rosenfeld to testify, but decided not to because calling Rosenfeld to testify would have alienated defendant.

The court denied the motion for judgment notwithstanding the verdict.

As the case proceeded to trial, the trial court was faced with Dove's "uncontroverted" representation that she was "not qualified to represent [defendant] in a three-strikes criminal case." The Office of the Public Defender would not accept appointment if there was to be joint representation. The court appointed that office to represent defendant in the criminal trial

B. *Permitting Telephone Calls with Cassinelli and Beth*

Defendant contends he was denied effective assistance of counsel because Dove permitted both Cassinelli and Beth to transmit privileged information to him over recorded telephone calls that were played at the competency trial. Citing the various portions of the calls where they discussed his competency trial, defendant argues Cassinelli "unreasonably permitted waiver of the attorney-client privilege" and Dove was responsible because Cassinelli was her jury "consultant/team member/transmitter." He contends Dove was responsible for the calls with Beth because Beth was Dove's client.

19

"The attorney-client privilege, set forth at Evidence Code section 954, confers a privilege on the client 'to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer. . . .' The privilege 'has been a hallmark of Anglo-American jurisprudence for almost 400 years.' [Citation.] Its fundamental purpose 'is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters. [Citation.]' " (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 732.) "Communication by a client retains its confidential nature, though made to an agent of the attorney, if the disclosure to that agent is reasonably necessary for the transmission of the information to the attorney." (*National Steel Products Co. v. Superior Court* (1985) 164 Cal.App.3d 476, 483.)

Dove had "very carefully informed" both defendant and Cassinelli that their conversations might not be covered by the attorney-client privilege. At the beginning of each call, a recording disclosed the call was both recorded and monitored. Defendant chose to speak with Cassinelli anyway. While speaking to Beth, defendant indicated his awareness that the calls were monitored: "I'm not going to say why right now 'cause of these phones." Although both Cassinelli and defendant knew about the recording and monitoring, there was no evidence that Dove knew of their phone calls in advance; in the excerpts played to the jury Cassinelli is not transmitting messages from Dove to defendant. There was evidence that Dove had hired Cassinelli in the past, that Cassinelli considered himself "part of that team," and that he occasionally transmitted messages from Dove to defendant. There was no evidence, however, that Dove had hired Cassinelli in connection with defendant's case or that he was Dove's agent. There was evidence that defendant had hired Cassinelli, but only to research defendant's background and identity, not to act as his agent with respect to his attorney. The record shows Cassinelli acted independently and not under Dove's control. He had called the court directly about getting a restraining order or something similar (the court referred the call

20

to legal staff).  Dove reported that Cassinelli was "unwilling" to listen to the two hours of recorded calls for her.  Defendant has failed to show that Dove had any involvement or knowledge of the calls between defendant and Cassinelli or that Cassinelli was the agent of Dove, so he failed to show that Dove was deficient in "permitting" the calls to take place.

Nor has defendant shown that Dove was deficient in her performance because defendant spoke with Beth about his case.  We presume counsel acted within the wide range of professional competence (*People v. Jones* (2003) 29 Cal.4th 1229, 1254), and defendant has provided no evidence to rebut that presumption on this issue.  Again, the record does not show that Dove was aware of these calls.  Nor is there evidence as to what, if anything, she advised Beth and defendant about their conversations.

C.  *Failure to Review and Investigate Tapes*

Defendant contends he received ineffective assistance of counsel because Dove failed to listen to and properly investigate the recorded calls.  Dove stated more than once that she had not listened to the tapes and later complained that she did not have time to put the excerpts in context.  Although the People respond that the record does not establish that Dove never listened to the tapes, we need not resolve this dispute because regardless of whether Dove's performance in this regard was deficient, defendant has failed to show prejudice.

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [80 L.Ed.2d 674, 699].)  "It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result

21

would have been different.  [Citations.]" (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.)

Defendant claims the omitted portions of the calls revealed his "illogical, convoluted, delusional or paranoid expressions" and this evidence would have supported his lack of competence.  But there was already *ample* evidence of defendant's delusions and irrational behavior from the *four* doctors who testified at the competency trial.  Defendant does not how this additional evidence would have been significantly different.  Despite the expert testimony, the jury was persuaded by the excerpts of recordings in which defendant's thorough understanding of the proceedings and ability to rationally assist his attorney (by making notes, diagrams, and lists) was manifest.  Defendant fails to show a reasonable probability that additional evidence of some delusional or paranoid statements to Cassinelli or Beth contained in the recordings would have effectively countered this compelling evidence of his competency.

D.  *Conflicts of Interest*

"A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution.  This constitutional right includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client." (*Doolin, supra*, 45 Cal.4th at p. 417.)  "For both state and federal purposes, a claim of conflicted representation is one variety of claim that counsel provided ineffective assistance.  Hence, to obtain reversal of a criminal verdict, the defendant must demonstrate that (1) counsel labored under an actual conflict of interest that adversely affected counsel's performance, and (2) absent counsel's deficiencies arising from the conflict, it is reasonably probable the result of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009-1010 (*Mai*).)  A defendant is required to make an "outcome-determinative" showing of prejudice to obtain relief. (*Doolin,* at p. 420.)

Defendant contends Dove labored under several conflicts of interest. First, he contends her financial interest in not "subsidizing" defendant's case financially caused her not to spend sufficient resources to be able to listen to the tapes. She claimed it was a problem with her computer that prevented her listening to them and she could not afford the expense of a duplicate copy of jail records. He also contends Dove had conflicting loyalties to him and Beth, as both were her clients. He asserts Dove acted solely to protect Beth, at his expense, when she failed to call Beth as a witness to explain the calls. Finally, he contends Dove's acrimonious relationship with Rosenfeld prevented her from calling him as a witness to his incompetency to stand trial. Rosenfeld had previously disparaged Dove's reputation and at the competency trial Dove expressed concern about Rosenfeld's presence in the courtroom (on another case), saying she did not subpoena him "because I absolutely cannot trust one word he says."

Defendant had failed to establish ineffective assistance of counsel based on an actual conflict of interest. He has failed to establish that Dove's financial interests were the reason Dove did not listen to the tapes (assuming she did not). Even if defendant could establish an actual conflict of interest as to finances, Beth, or Rosenfeld, he has failed to show "that a different strategy would likely have been adopted by competent, unconflicted counsel." (*Mai, supra,* 57 Cal.4th at p. 1014.) He fails to show that a fuller preparation and investigation of the tapes, calling Beth to explain their contents, or calling Rosenfeld to testify about defendant's incompetency would have resulted in a different result at the competency trial. After all, four experts opined that defendant was incompetent to stand trial. Defendant does not explain what evidence Dove could have produced absent the alleged conflicts of interest or how it would have challenged the strong evidence of his competency that countered and outweighed four expert opinions.

Defendant requests that if we determine that the record is not sufficiently developed to permit adjudication of his ineffective assistance of counsel claims, we remand for an evidentiary hearing. Defendant cites *Williams v. Taylor* (2000) 529 U.S.

420 [146 L.Ed.2d 435], in which the high court considered the diligence required before a criminal defendant could receive an evidentiary hearing on a federal habeas claim. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court *in the manner prescribed by state law*." (*Id.* at p. 437 [146 L.Ed.2d at p. 452], italics added.) Where a claim of ineffective assistance of counsel cannot be resolved on the appellate record, the proper procedure in California is a habeas corpus proceeding. (*Mai, supra,* 57 Cal.4th at p. 1009*; People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 ["A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding."].) Accordingly, we deny defendant's request for remand for an evidentiary hearing.

## DISPOSITION

The judgment is affirmed.

                                   /s/
                                   Duarte, J.


We concur:


        /s/
Nicholson, Acting P. J.


        /s/
Hoch, J.